**UNITED STATES of America,
Appellee,**

v.

**Daniel REID and Theodore E. Thomas,
Jr., Defendants-Appellants.**

Nos. 771, 772, Dockets 74–2598, 74–2599.

United States Court of Appeals,
Second Circuit.

Argued March 5, 1975.

Decided April 24, 1975.

Ronald Gene Wohl, New York City, for defendant-appellant Reid.

E. Thomas Boyle, Fed. Defender Services, Legal Aid Society, New York City (William J. Gallagher, and The Legal Aid Society, Fed. Defender Services Unit, New York City, of counsel), for defendant-appellant Thomas.

Steven A. Schatten, Asst. U. S. Atty. (Paul J. Curran, U. S. Atty. for the Southern District of New York, and John D. Gordan, III, Asst. U. S. Atty., of counsel), for appellee.

Before FRIENDLY and MANSFIELD, Circuit Judges, and BARTELS, District Judge.*

FRIENDLY, Circuit Judge:

About four o'clock in the afternoon of August 1, 1974, Special Agent Patrick Shea of the Drug Enforcement Administration (DEA) went to a barbershop in the Bronx to get a haircut during a late lunch period. Five minutes later, hearing a commotion in an immediately adjacent liquor store, he rose from the barber's chair and, still clad in his gown, entered the store, but not before taking out his DEA badge, clearly displayed in its case, with one hand and drawing his Government-issued revolver with the other. He observed defendant Reid[1] on the floor beating the proprietor, John McArdle, with a broken bottle.[2] Shea shouted "Freeze, police." Reid stood up and faced him. Shea then became aware of the presence in another corner of the store of defendant Thomas, whom he also told to "freeze." Instead, while Shea's attention was fixed on Reid, Thomas succeeded in crossing the room and, holding a long-barreled automatic pistol, got the drop on Shea, directed him to surrender his revolver, took this and Shea's DEA badge, and ordered Shea to get down on the floor. Shea complied but, while on his stomach, kept his attention focused on Thomas. Thomas then shot Shea in the right arm, shattering the radial bone. When Shea cried "You shot me", scarcely news to Thomas, the latter answered "I am going to kill you." Thomas fired another shot, happily without the consequence desired, and waited for Reid to join him at the front of the store. Reid and Thomas then fled, the latter leaving his eye-glasses,

---

* Of the District Court for the Eastern District of New York, sitting by designation.

1. In stating the facts we follow Shea's testimony and assume the correctness of the identifications. See Part IV, *infra*.

2. As appellant Reid has acknowledged, McArdle had been repeatedly stabbed with an ice pick. He died four weeks later. While we were told this was from a heart attack and not from the wounds, the treatment administered by the defendants had hardly done him any good. No murder charge was brought by the State. Reid and Thomas pleaded guilty to one count of a state indictment charging a number of offenses (attempted murder of both Shea and McArdle, robbery of both Shea and McArdle, possession of a dangerous weapon) arising from the same incident and were sentenced to three to six years imprisonment.

which were later identified by an optician and his technician, who had issued two pairs of glasses to Thomas, as being in all respects similar to those issued. Despite his serious injury, Shea attempted to pursue on foot but Thomas fired two shots at him, forcing him to seek cover, and the two men entered a Buick station wagon, the license plate number of which Shea was able to observe and recall. They drove off at high speed, striking another vehicle in attempting a U-turn, with Thomas at the wheel. Shea rejoined the pursuit in his unmarked DEA automobile but was unable to regain sight of them and sought medical attention. The Buick station wagon was later discovered in Manhattan and investigators were able to lift several latent fingerprints from it which upon analysis turned out to be those of Thomas. Three days later Reid and Thomas were apprehended in Ohio in a Pontiac which was stolen, according to a garage attendant, by Reid and an accomplice on July 29, 1974. According to the arresting officer, Reid threw a revolver, identified as the one stolen from Shea, out of the driver's window.

The indictment, in the District Court for the Southern District of New York, charged Reid and Thomas in seven counts with assaulting a federal officer with a deadly weapon, a revolver (18 U.S.C. § 111) (Count One); the wounding of Special Agent Patrick Shea, as lawful custodian of Government property in effecting a robbery of property of the United States, namely, a revolver (18 U.S.C. § 2114) (Count Two); unlawful use of a firearm in the commission of a federal felony (18 U.S.C. § 924(c)) (Count Three); robbery of property of the United States (18 U.S.C. § 2112) (Count Four); theft of Government property valued in excess of $100 (18 U.S.C.

§ 641) (Count Five); transportation of a stolen firearm in interstate commerce (18 U.S.C. §§ 922(i), 924(a)) (Count Six); and transportation of a stolen motor vehicle in interstate commerce (18 U.S.C. § 2312) (Count Seven). After trial before Judge Conner and a jury, the jury convicted on all counts except Count Five, on which they acquitted, apparently because of doubt as to value of the stolen Government property. Judge Conner imposed concurrent prison sentences, as follows:

|  | Reid (in years) | Thomas (in years) |
| --- | --- | --- |
| Count 1 | 6 | 8 |
| Count 2 | 25 | 25 |
| Count 3 | 6 | 8 |
| Count 4 | 3 | 3 |
| Count 6 | 2 | 2 |
| Count 7 | 2 | 2 |

Bail was continued and this appeal followed.

### I. The Legal Sufficiency of Count Two.

We may as well proceed directly to the defendants' attack on Count Two[3] on the basis that § 2114 is limited to offenses having a postal nexus. After this case was argued, we sustained that contention in United States v. Rivera, 513 F.2d 519, 531–532 (2 Cir. 1975), agreeing with the concession of the Solicitor General in United States v. Hanahan, 442 F.2d 649 (7 Cir. 1971), vacated and remanded for reconsideration in light of Solicitor General's position, 414 U.S. 807, 94 S.Ct. 169, 38 L.Ed.2d 43 (1973), and the decision in United States v. Fernandez, 497 F.2d 730, 739–40 (9 Cir. 1974). See also United States v. Spears, 145 U.S.App.D.C. 284, 449 F.2d 946, 951–54 (1971).

---

3. This count was included in a superseding indictment, 74 Cr. 968, handed up a week before the trial. Defendants consistently contended that the count was without legal basis since § 2114 was limited to assaults on postal employees. Although the failure of counsel to acquaint the judge with the Ninth Circuit's decision in United States v. Fernandez, cited in text *infra*, may be excusable in light of its recent date, it is inexplicable that the United States Attorney apparently was not aware of the position taken by the Solicitor General with reference to § 2114 in United States v. Hanahan, also cited in text *infra*, over a year before the superseding indictment.

Further research on our part has made the correctness of that view even clearer. At the time of the 1935 amendment to § 2114, Act of August 26, 1935, ch. 694, 49 Stat. 867, which added the phrase "money or other property of the United States" to "mail matter" in 18 U.S.C. § 320 (1934 ed.), § 320 stood in the portion of the Criminal Code, then Chapter 8, entitled Offenses Against Postal Service (Code of Laws of the United States of America in Force January 3, 1935). Its predecessors had been similarly organized in codifications having the force of positive law. See Act of March 4, 1909, An Act To codify, revise, and amend the penal laws of the United States, ch. 321, § 197, 35 Stat. 1126 (part of Chapter Eight, Offenses Against the Postal Service); Rev.Stat. §§ 5472, 5473 (1878) (part of section devoted to Postal Crimes). The 1935 amendment, H.R. 5360, 74th Cong., 1st Sess. (1935), came in response to a 1933 request from the Postmaster General and was handled in the House by the Committee on the Post Office and Post Roads, see H.R.Rep. No. 582, 74th Cong., 1st Sess. (1935), and in the Senate by the Committee on Post Offices and Post Roads, see Sen.Rep. No.

1440, 74th Cong., 1st Sess. (1935). Despite the generality of the language in the amendment and in the titles and language of the committee reports, no one would have entertained any doubt of the limited scope of § 320 if it had been allowed to remain in the chapter of the Criminal Code where Congress had placed it.[3a] And remain it did for a period of years in codifications which, though unofficial, were widely used. See 18 U.S.C. § 320 (Cum.Supp. V, The Code of the Laws of the United States of America, 1934 Edition (1939)); 18 U.S.C. § 320 (1940 ed.); 18 U.S.C. § 320 (1946 ed.). The Reviser's transfer of § 320 in 1948, Act of June 25, 1948, ch. 645, 62 Stat. 797, to Chapter 103, Robbery and Burglary, where it now appears as § 2114,[4] with what were characterized as "[m]inor changes . . . in phraseology," did not expand the meaning Congress had entertained in 1935. Although constituting positive law, "[t]he 1948 Revision was not intended to create new crimes but to recodify those then in existence." Morissette v. United States, 342 U.S. 246, 266–69 n. 28, 72 S.Ct. 240, 253, 96 L.Ed. 288 (1952).[5]

**3a.** It is rather strange that the dissent should quote from United States v. American Trucking Ass'n, 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940), a leading authority against the "plain meaning" doctrine, as if it were one in its favor. The two sentences chosen for quotation should be read along with the paragraph that preceded and the remainder of the paragraph that followed them, 310 U.S. at 542–44, 60 S.Ct. 1059, and in light of the result the Court actually reached. . There was, of course, nothing novel in Mr. Justice Reed's eloquent and explicit repudiation of the "plain meaning" doctrine; Chief Justice Marshall had written many years before:

> Where the mind labors to discover the design of the legislature, it seizes everything from which aid can be derived.

United States v. Fisher, 2 Cranch (6 U.S.) 358, 386, 2 L.Ed. 304 (1805). See also United States v. Dickerson, 310 U.S. 554, 561–62, 60 S.Ct. 1034, 84 L.Ed. 1356 (1940). Whatever is the appropriate weight to be given to the remarks of Representative Dobbins, see United States v. Rivera, 513 F.2d 519, 531 n. 18 (2 Cir. 1975), reliance on these now turns out to be unnecessary in view of the fact that, as we have now learned, the 1935 amendment was to

a statute which stood in the chapter of the Criminal Code dealing with offenses against the postal service. No Congressman could have supposed that, in passing an amendment to that section proposed by the Postmaster General and recommended by the committees dealing with the postal service, he was creating a new crime with respect to government property generally.

**4.** This was a misguided effort on any view since the robbery of any government property had long been covered by what is now 18 U.S.C. § 2112, see e. g., Act of March 2, 1867, ch. 193, 14 Stat. 557, codified in Rev.Stat. § 5456; 18 U.S.C. § 99 (1946 ed.), and the real importance of § 320 was that its assault provisions covered all postal employees whereas the only postal employees covered in the general statute concerning assaults on federal officers, 18 U.S.C. §§ 253 and 254, were "post-office inspectors".

**5.** The broad view of the meaning of § 2114 taken by the office of the United States Attorney for the Southern District of New York has not been shared by careful students of the Criminal Code. The Brown Commission, which had responsibility for drafting the Pro-

The prosecution now has cause to regret its error in including Count Two in the superseding indictment since the judge might well have imposed higher sentences on other counts if he had known the conviction on Count Two with the mandatory 25 year sentence was invalid. But the difficulty was of the Government's own making in that the draftsman of the superseding indictment did not follow or, as we gathered at argument, did not know of the Solicitor General's proper concession in *Hanahan* and is beyond our power to remedy.

## II. *Whether the evidence warranted a conviction under § 111.*

The most interesting and important question raised is whether Agent Shea was assaulted "while engaged in or on account of the performance of his official duties", 18 U.S.C. § 111, as charged in Count One.

Before dealing with that issue, we must pause over a point which, although not raised by appellants, has come to our attention as a result of our study of this appeal. Since the point goes to the basic question whether Count One charged the commission of a crime and, if not now disposed of, will almost certainly become the basis for a proceeding under 28 U.S.C. § 2255 or F.R.Cr.P. 35, we think it best to decide it now. See United States v. Rivera, *supra*, 513 F.2d at 531–532.

Instead of accepting the proposal of Attorney General Cummings in 1934[6] to make an assault on "any civil official, inspector, agent, or other officer or employee of the United States" a federal crime, H.R. Rep. No. 1455, 73d Cong., 2d Sess. 1 (1934), Congress adopted the practice of limiting the offense to assault, etc., upon specified categories of federal officers. The pattern, established in the Act of May 18, 1934, ch. 299, 48 Stat. 781, has been the backhanded one of listing these categories in a section, now 18 U.S.C. § 1114, making their killing a homicide punishable in the same way as homicides as defined in other sections, now §§ 1111 and 1112, and then limiting the assault statute, § 111, to them.[7] Difficulty has arisen recently when executive reorganization plans have transferred a function from a category named in § 1114 to a newly created one and the assault has occurred before Congress has been able to revise that section to reflect the change.

That is the situation here since, although the Attorney General transferred the functions of the Bureau of Narcotics and Dangerous Drugs (BNDD) to the DEA by amendment of the Code of Federal Regulations, see 38 F.R. 18380, on July 10, 1973, pursuant to Executive Order 11727 of four days earlier, Reorganization Plan No. 2 of 1973 (effective July 1, 1973), 38 F.R. 15932 (1972), 87 Stat. 1091, and 38 F.R. 18357 (1972), Congress did not get around to amending § 1114 to substitute "Drug Enforcement Administration" for "Bureau of Narcotics and

posed New Federal Criminal Code, see Final Report of the National Commission on Reform of Federal Criminal Laws § 201, Comment at p. 15 (1971) (in discussing a proposed new jurisdictional basis for treating property crimes against the United States) noted that present coverage was somewhat spotty and dispersed: "Title 18 U.S.C. § 2112, for example, limits robbery to property belonging to the United States, while § 2114 deals with the mail." Senator McClellan's memorandum on the history and various aspects of his Proposed Code, The Challenge of a Modern Federal Criminal Code, in Hearings on Reform of the Federal Criminal Laws Before the Subcomm. on Criminal Laws and Procedures of the Senate Comm. on the Judiciary, 92d Cong., 1st Sess., part 1, at 21, 36 (1971), discussed the instances in which the offense of robbery now dealt with in chapter 103 of title 18 would be retained under his bill: "special maritime and territorial jurisdiction (section 2111); property of the United States (section 2112); Federal Deposit Insurance Corporation banks (section 2113); and the mails (section 2114)."

6. The Attorney General's letter to the chairman of the Senate Judiciary Committee has been reproduced in Ladner v. United States, 358 U.S. 169, 174–75, 79 S.Ct. 209, 3 L.Ed.2d 199 (1958) and, very recently, in United States v. Feola, 420 U.S. 671, 680, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975).

7. The saga of § 2114 and the incredible complexity and unintelligible distinctions in the coverage of the assault-homicide sections attest to the urgent need for a new Criminal Code, see note 5 *supra*.

Dangerous Drugs" until October 26, 1974, see Pub.L. 93–481, § 5, 88 Stat. 1456, nearly three months after the assault on Agent Shea.

A similar problem had arisen when the functions of the Treasury's Bureau of Narcotics, which had been on the list in § 1114, were transferred to the BNDD in 1968, Reorganization Plan No. 1 of 1968 (effective April 8, 1968), 33 F.R. 5611, 82 Stat. 1367. In United States v. Hasiwar, 69 Crim. 58 (S.D.N.Y., May 25, 1970), Judge Bonsal reluctantly ruled, in an unreported opinion, that an indictment charging an assault on BNDD special agents in the interval between the transfer of functions and later amendment of § 1114 must be dismissed. Although the judge expressed the hope that the Government would appeal, it did not. When the problem presented by the transfer of functions from the BNDD to the DEA arose in another circuit, Judge Noel ruled to the same effect, stating that § 1114 "does not purport to cover successor agencies to those enumerated". United States v. Irick, 369 F.Supp. 594, 597 (S.D.Texas 1974). However, his judgment was reversed, 497 F.2d 1369 (5 Cir. 1974), petition for certiorari denied sub nom., Peel v. United States, 420 U.S. 945, 95 S.Ct. 1325, 43 L.Ed.2d 423 (1975), the opinion having been rendered before Congress amended § 1114 to make the substitution.

■ The cornerstone of Judge Ainsworth's opinion for the Fifth Circuit is that neither district court decision had taken account of 5 U.S.C. § 907(a), dealing with executive reorganizations and entitled "Effect on other laws, pending legal proceedings, and unexpended appropriations." This provides in pertinent part:

> A statute enacted . . . before the effective date of the reorganization, has, except to the extent rescinded, modified, superseded, or made inapplicable by or under authority of law or by the abolition of a function, the same effect as if the reorganization had not been made.

The court construed this to mean:

> Basically, when a reorganization takes place, section 907(a) continues in effect laws existing prior to the reorganization. Any statute relating to an agency and enacted before the effective date of the reorganization of that agency has the same effect as if there had been no reorganization. Thus, special agents of the Drug Enforcement Administration fall within the ambit of section 111, by virtue of the provisions of section 1114, in the same manner as did the special agents of the Bureau of Narcotics and Dangerous Drugs.

497 F.2d at 1372. This seems to us to be a reasonable interpretation and to accord with what legislative history there is with respect to predecessor statutes to § 907(a), which was enacted as part of the 1966 codification of title 5. Act of September 6, 1966, Pub.L. 89–554, 80 Stat. 378. See H.R.Rep. No. 23, 81st Cong., 1st Sess. (1949), in 1949 U.S.Code Cong.Service, pp. 1381, 1391 (emphasis added) ("This section contains savings provisions with respect to the status, after a reorganization, of statutory provisions . . . *having a relation to any agency* or function affected by such reorganization."); H.R.Rep. No. 120, 76th Cong., 1st Sess. 6 (1939), quoted in 497 F.2d at 1372 (The savings provision "provides for the survival of . . . laws in connection with reorganizations."). Moreover, we see nothing in the legislative history of the 1974 amendment to § 1114, which substituted the DEA for the BNDD, see H.R.Rep. No. 93–1442, 93d Cong., 2d Sess. (1974), in 1974 U.S. Code Cong. & Admin.News, pp. 5910, 5914; 120 Cong. Rec. S. 12275, 12321 (daily ed. July 11, 1974) (remarks of Senator Cook); 120 Cong. Rec. H. 10578 (daily ed. Oct. 15, 1974) (remarks of Rep. Rogers making express reference to the *Irick* district court opinion), that would constitute a ratification of the district court opinion in *Irick*. That decision had not yet been reversed when the Senate acted and the reversal apparently was not brought to the attention of the

House. Rather than approving the district court decision in *Irick*, Congress was tidying matters up and avoiding the need for future resort to 5 U.S.C. § 907(a) by the Government.

■ Returning to the basic issue, we begin by setting out a paragraph in § 6641.5 of the DEA Agents Manual, a section entitled "Arrests for Violations Outside DEA Jurisdiction," which provides:

> Should an agent happen to witness a State violation (whether he is on or off duty) the Administration expects him to take reasonable action as a law enforcement officer to prevent the crime and/or apprehend the violator. This policy applies only to felonies or violent misdemeanors. It does not apply to traffic violations or other minor offenses.[8]

The judge instructed the jury that, in order to convict on Count One, it must find that at the time of the assault Shea "was engaged in the performance of his official duties", read to the jury this extract from the manual (omitting the last sentence), and noted a stipulation by the defendants that a felony or a violent misdemeanor was taking place inside the liquor store. He also instructed that, as a matter of law, Shea would not have been within the scope of his official duties if he "was engaged in a personal frolic, if he was acting purely as a private citizen . . . ." While submission of the issue to the jury may have been unnecessary if, on the undisputed evidence, the assault on Agent Shea occurred while he was engaged in or was on account of the performance of his official duties, such submission has been approved inferentially in some opinions, see United States v. Frizzi, 491 F.2d 1231, 1232 (1 Cir. 1974); United States v. Michalek, 464 F.2d 442, 443 (8 Cir. 1972), and doubtless is the wiser course.

Both sides rely on our opinion in United States v. Heliczer, 373 F.2d 241, 244–46 (2 Cir.), cert. denied, 388 U.S. 917, 87 S.Ct. 2133, 18 L.Ed.2d 1359 (1967). The Government finds comfort in the discussion at pp. 244–45, which, as it correctly says, disposes of defendants' point that, if Agent Shea had been able to make an arrest, he would have been making it under New York law and only with the power that New York gives an ordinary citizen to make an arrest for a felony. See N.Y.Code Crim.P. § 183(2); *id.* § 177; United States v. Viale, 312 F.2d 595, 599–601 (2 Cir.), cert. denied, 373 U.S. 903, 83 S.Ct. 1291, 10 L.Ed.2d 199 (1963). It also finds assistance in Judge Anderson's oft quoted statement:

> The test is whether the agent is acting within that compass or is engaging in a personal frolic of his own.

8. The full section reads:

6641.5 ARRESTS FOR VIOLATIONS OUTSIDE DEA JURISDICTION. Section 508(3) of the CSA provides "any officer or employee of DEA designated by the Attorney General may make arrests without warrant.
A. For any offense against the United States committed in his presence, or
B. For any felony cognizable under the laws of the United States, if he has probable cause to believe that the person to be arrested has committed or is committing a felony."
Should an agent happen to witness a Federal violation (whether he is on or off duty) the Administration expects him to take reasonable action as a Federal enforcement officer to prevent the crime and/or apprehend the violator under the above authority.
Should an agent happen to witness a State violation (whether he is on or off duty) the Administration expects him to take reasonable action as a law enforcement officer to prevent the crime and/or apprehend the violator. This policy applies only to felonies or violent misdemeanors. It does not apply to traffic violations or other minor offenses.
Unless specifically authorized as a peace officer under State law, the agent's authority in these situations is that of an ordinary citizen. A detailed discussion of the agent's authority to make arrests under various State laws can be found in Appendix 66A. The Administration will fully support the agent for any reasonable action taken by him in these situations.
Firearms will be fired only in self-protection or for the protection of others, not to prevent a violator from fleeing or destroying evidence.

373 F.2d at 245. Whatever Agent Shea was doing, it was far from a frolic, as events proved. Defendants call attention to the previous sentence to which the word "within that compass" refer. There Judge Anderson said that " '[e]ngaged in . . . [the] performance of official duties' is simply acting within the scope of what the agent is employed to do." They argue that Agent Shea was "employed to do" what the Attorney General had designated as DEA's official responsibilities.[9] They say that, insofar as the Agents' Manual goes beyond this, the use of it is a bootstrapping operation by the prosecutor which cannot enlarge the scope of § 111. Indeed at trial counsel for Thomas characterized the passage in question as a mere "general admonition to an agent that as an agent he is expected to be a good citizen."

Defendants appear to accept, as we think they must, that § 6441.5 applies to all state felonies and violent misdemeanors; they have not argued that the reference in § 6641.5 to "a State violation" is only to a violation of a state narcotics law. However, they call attention to what they consider to be significant differences between the language of § 6641.5 quoted above in text and the language in the preceding sentence of that section, see note 8 *supra*. The difference does not seem significant to us in the context of this case. It merely calls the agent's attention to the fact that, in contrast to arrests for federal offenses, where he is authorized by federal law, § 508(3) of the Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub.L. No. 91–513, 21 U.S.C. § 878(3) (authority to make arrests without warrants in certain instances granted in terms to BNDD agents and transferred to DEA agents by Reorganization Plan No. 2 of 1973, supra, see 21 U.S.C.A. § 878 Note (1975 Supp.)), to arrest for any offense against the United States committed in his presence or if he has probable cause to believe that the person to be arrested has committed or is committing a felony, in arresting for state offenses, as stated in the following paragraph of that section of the manual, he will act in arresting for state offense as a law enforcement officer with the authority of an ordinary citizen unless the state has given him the powers of a peace officer.[9a]

We do not find *Heliczer* so dispositive as claimed by either side. Compared to ours, that case was an easy one. The narcotics agents there were arresting one Martin, previously arrested for a federal narcotics violation and released on bail, who had threatened to kill the informant whose statements had led to his previous arrest. The second arrest was in performance of the agents' official duties in the narrowest sense of that term, and no less so because in the absence of a warrant the arrest had to be based on New York law. The same is true of other cases cited by the Government, such as United States v. Cho Po Sun, 409 F.2d 489 (2 Cir.), cert. denied, 396 U.S. 864, 90 S.Ct. 140, 24 L.Ed.2d 118

---

**9.** 28 C.F.R. §§ 0.100–0.104. Section 0.101 provides:

§ *0.101. Specific functions.*
    Subject to the general supervision of the Attorney General, and under the direction of the Deputy Attorney General, the Administrator shall be responsible for:
    (a) The development and implementation of a concentrated program throughout the Federal Government for the enforcement of Federal drug laws and for cooperation with State and local governments in the enforcement of their drug abuse laws.
    (b) The development and maintenance of a National Narcotics Intelligence System in cooperation with Federal, State, and local

officials, and the provision of narcotics intelligence to any Federal, State, or local official that the Administrator determines has a legitimate official need to have access to such intelligence.

**9a.** Defendants argue that since the agent is only "expected" to intervene whether on or off duty, it is clear that he is not employed or required to do so. We attach no importance to the use of the word "expect" rather than some stronger verb since the word is used with respect to arrests for federal violations as well as for state violations and there is little question that the agent is employed to arrest for federal violations.

(1969); United States v. Martinez, 465 F.2d 79, 82 (2 Cir. 1972). See also United States v. Michalek, *supra*, 464 F.2d 442. On the other hand, defendants' reading of the words "what the agent is employed to do" both begs the question and proves too much since it would apply equally in a case where, *e. g.*, a DEA agent witnessed an assault on a federal judge.

Defendants have not cited to us an old case that is highly favorable to them, at least in its dicta, Whipp v. United States, 47 F.2d 496 (6 Cir. 1931), although Thomas' trial counsel had brought it to the judge's attention at the sentencing. Appellants there had been convicted under then 18 U.S.C. § 118, one of the predecessor statutes for § 111, of forcibly assaulting, resisting, etc., an employee of the Bureau of Animal Husbandry in the execution of his duties. The facts were unusual. Ohio statutes provided for the testing of cattle for infectious diseases and for co-operation with federal authorities for that purpose. Federal statutes also provided authority for the Department of Agriculture to investigate and suppress outbreaks of such diseases in certain instances. Defendants had objected to the tests proposed by Ohio officers, sought a state court injunction to restrain the state veterinarian from performing certain tests, and secured a temporary injunction. In an effort to avoid the effect of this, state officers obtained the services of an inspector from the Bureau of Animal Husbandry to accompany them during the proposed tests to create the impression that the inspector was acting on behalf of the United States. The acts recited in the indictment occurred when defendants resisted the attempt to complete the tests.

The court was unable to find that any federal statute provided a basis for the "duty" which the inspector undertook; rather, the only authority for the making of such tests was in state statutes. The court therefore held that since the inspector was not performing a federal duty, appellants could not be convicted for resisting him. The case can readily be distinguished, of course, on the basis that, whatever may be the duties of a federal officer to assist in preventing violation of state laws, these cannot include an effort deliberately to circumvent a state court order. However, the court's language went far beyond this:

At the trial of the defendants it was not shown that any of the cattle of the defendants were suffering from tuberculosis or other communicable disease, that any exportation or interstate transportation of such live stock was contemplated by the defendants, that the Secretary of Agriculture had reason to believe that such diseases existed in that locality, or that any quarantine had been established pursuant to the above-mentioned powers of the Secretary of Agriculture. Under such circumstances we search in vain for evidence of any federal duty in the performance of which the inspector of the Bureau of Animal Industry was engaged, and it is immaterial whether or not he was employed at the time in the execution of a state law or in the assistance of state officers, even though such employment arose by virtue of his connection with the Bureau of Animal Industry, provided he was acting solely under and by virtue of the state laws. It is objected that it is not necessary that the particular act upon which the federal agent is engaged shall be specifically enumerated in an act of Congress, but that it is sufficient if the alleged official action be governed by a lawful requirement of the Department under whose authority the officer is acting. United States v. Birdsall, 233 U.S. 223, 34 S.Ct. 512, 58 L.Ed. 930. This may be conceded; but the particular act must nevertheless be responsive to some equally particular requirement of federal authority, in order to make such act one in the performance of a federal duty. A mere general policy of mutual co-operation is not enough. The fallacy of the argument lies in the assumption that, because he is acting in co-operation with state officers, and

because the federal law requires such co-operation, all acts of the federal inspector must necessarily be done in the performance of a federal duty. Whether this is so or not really depends upon whether the act is performed in the administration of a state or federal law, or upon the initiative of a state or federal executive. The mere fact that by virtue of established comity a federal officer was procured to be present and demand the right to make this test does not alter the fact that the only authority for making such tests can be found in the state statutes, except and unless it be in connection with interstate commerce. *Id.* at 497, see also *id.* at 498. To even things up, the Government likewise has not cited the case most helpful to it, to wit, a decision bearing the unusual name of Walks on Top v. United States, 372 F.2d 422 (9 Cir.), cert. denied, 389 U.S. 879, 88 S.Ct. 109, 19 L.Ed.2d 170 (1967). This sustained a conviction for assault on a federal officer where the defendant was being arrested for a state law violation by a federal and a state officer, who had "cross-deputized" each other. The case, however, can be distinguished on the basis that the arrest was being made by a policeman of the Bureau of Indian Affairs on an Indian reservation, where state officers could not make an arrest.

If we were able to follow Judge Hufstedler's concurring opinion in United States v. Fernandez, *supra,* 497 F.2d 745, this would afford a fairly straight path toward affirmance. Her thesis was as follows:

> Probably motivating the enactment of the assault portion of section 111 was a congressional desire to fill a gap in the state laws defining aggravated assaults: state laws mandated increased punishment only for assaults on state peace officers (*cf. e. g.* People v. Garfield (Utica City Ct. 1970) 63 Misc.2d 79, 312 N.Y.S.2d 830; Cal.Penal Code §§ 241, 830.1, 830.2, 830.6(a)); if the person assaulted was a federal officer, the assailant would only be punishable under state law for simple assault.

Section 111 accordingly provides for punishment in excess of that which states would impose (*compare* 18 U.S.C. § 111 *with, e. g.,* Cal.Penal Code § 241) for assaults on those involved in the investigation or enforcement of federal laws.

Since some state aggravated assault statutes equally did not include federal law enforcement officers who happened to engage in suppressing state crime, presumably Congress would have meant to embrace them. Our difficulty is that Judge Hufstedler considered her thesis to compel the conclusion that knowledge of the federal status of the victim was an essential element of the offense—a position which was rejected by us over ten years ago. United States v. Lombardozzi, 335 F.2d 414 (2 Cir.), cert. denied, 379 U.S. 914, 85 S.Ct. 261, 13 L.Ed.2d 185 (1964), and which has now been rejected by the Supreme Court, United States v. Feola, *supra.*

Although *Feola* was addressed to this different problem, language in the opinion is helpful to the Government. The Court spoke of the assault statute in broad terms. Mr. Justice Blackmun said at one point:

> Fulfillment of the Congressional goal to protect federal officers required then [in 1934], as it does now, the highest possible degree of certainty that those who killed or assaulted federal officers were brought to justice.

420 U.S. at 684, 95 S.Ct. at 1263. At another point he said in a footnote:

> It is more plausible, we think, to conclude that Congress chose not to entrust to the States sole responsibility for the interdiction of attacks, fatal or not, upon federal law enforcement officials—a matter essential to the morale of all federal law enforcement personnel and central to the efficacy of federal law enforcement activities.

420 U.S. at 685 n. 18, 95 S.Ct. at 1264. His reasoning that an interpretation of § 111 as not requiring *scienter* with respect to federal status was "no snare for the unsuspecting" is equally applicable

here; the defendants had no illusion that they were engaging in "legitimate conduct." Most important, we now know from *Feola* that § 111 has the objective of protecting federal law enforcement officers and not merely, as some had thought from *Ladner v. United States, supra,* 385 U.S. at 175–76, 79 S.Ct. 209, only federal law enforcement.[10]

■■ Endeavoring to place ourselves in the position of the Congress that enacted the predecessors of §§ 111 and 1114 in 1934, 48 Stat. 780, and of later Congresses that have approved amendments, we think we would have wished the vague language "while engaged in or on account of the performance of his official duties" to be read to include conduct such as Agent Shea's, at least when, as here, he had been officially instructed that was "expected" of him and that the DEA would stand back of him. The rather whimsical caution of Congress with respect to limiting the categories of protected federal employees[11] does not compel the conclusion that the scope of the protection was to be narrowly limited. Congress was not using the word "duties" in a strict Hohfeldian sense.[12] It was thinking in terms of what the officer ought to do because of being an officer. Agent Shea had been trained in law enforcement at the expense of the public, including citizens of New York, such as the victim of the liquor store robbery here. Public opinion would have been properly offended if Agent Shea had continued to sit in a barber's chair while a robbery was being committed a few yards away. Federal narcotics agents must rely heavily for help on state law enforcement officers, as is shown, e. g., in *United States v. Heliczer, supra,* 373 F.2d at 244, where they had to be rescued from an angry mob by a detail of twenty or thirty New York City policemen, and in *United States v. Rivera, supra,* 513 F.2d at 524, where they needed the help of New York City police to pursue a fleeing participant in an attempted rip-off during what had been supposed to be a sale of narcotics. Some reciprocation is surely in order. If Agent Shea had heard a New York City policeman in the liquor store calling for help, surely he would have had a greater duty to respond than the ordinary passerby. We see no sufficient distinction in the fact that here the agent acted without such a call. If DEA agents or other federal law enforcement officers do what they are properly expected to do in the enforcement of state criminal laws, they should have the same federal protection they would receive in the performance of their other duties.[13] We read the statute as a direction by Congress that they do.

### III. Alleged error in the charge with respect to Count III.

As stated, Count III was for the unlawful use of a firearm in the commission of a federal felony, 18 U.S.C. § 924(c)(1). Believing the evidence showed that Shea's revolver was the firearm used by Thomas, the judge

---

10. Although Mr. Justice Stewart, dissenting, characterized *Feola* as a "revisionist treatment" and indeed a subversion of *Ladner,* 420 U.S. at 706, 709–713, 95 S.Ct. 1255, Mr. Justice Brennan, who had authored *Ladner,* evidently did not so regard it since he joined the *Feola* majority.

11. *E. g.,* a United States Attorney or Assistant United States Attorney but not the Attorney General or even the Assistant Attorney General in charge of the Criminal Division of the Department of Justice; a federal judge but not a federal court clerk, etc.

12. See his quotations from Lake Shore & M. S. R. Co. v. Kurtz, 10 Ind.App. 60, 37 N.E. 303,

304 (1894): " 'Duty' and 'right' are correlative terms. When a right is invaded, a duty is violated," and from McGhee v. Railroad Co., 147 N.C. 142, 146, 60 S.E. 912 (1908), "The expression 'duty' properly imports a determinate person to whom the obligation is owing, as well as the one who owes the obligation." Hohfeld, Fundamental Legal Conceptions 38, 94–95 (1919).

13. Our holding that the assault on Agent Shea came within § 111 would not necessarily entail a similar holding if the intervention were by persons listed in § 1114 whose duties are not law enforcement in its narrow sense, e. g., designated employees of the Department of Agriculture.

charged that the jury could convict on Count III if, but only if, it found that the revolver was used in committing one or more of the felonies charged in Counts One, Two, Four or Five. Since the jury acquitted on Count Five, it obviously did not use this as a predicate felony for conviction under Count Three.

The contention stressed by defendants in brief was that it was error to include Counts Two and Four, both involving robbery of the property of the United States, since the robbery of the revolver was complete before Thomas used it, and that this requires reversal since the jury might have utilized one or the other of those counts as the felony predicate. We agree with the Government that the premise, as so stated, is unsound. To constitute robbery, there "must be both a taking *and a carrying away* of the property." Clark & Marshall, Law of Crimes § 12.09, at 882 (7th ed. 1967). At the time of the shooting Agent Shea had not given up on the prospect of arresting the defendants and retrieving his revolver; indeed he did not give up thereafter. Moreover, both before and after the shooting, there was always a chance, however small, of intervention by other law enforcement officers or good Samaritans. As said in United States v. Von Roeder, 435 F.2d 1004, 1010 (10 Cir.), vacated on other grounds, 404 U.S. 67, 92 S.Ct. 326, 30 L.Ed.2d 222 (1971):

> The escape phase of a crime is not, as appellant apparently argues, an event occurring "after the robbery." It is part of the robbery.

Now, however, because of our having vacated the conviction on Count Two, defendants' premise that one of the counts would not support a conviction has become true. But their con-

clusion still does not follow. This is because of an alternative ground for affirmance advanced by the Government. While the general principle is that, as stated long ago in Nicola v. United States, 72 F.2d 780, 787 (3 Cir. 1934), "Where two instructions are given to the jury, one erroneous and prejudicial and the other correct, it is impossible to tell which one the jury followed and it constitutes reversible error," see also Mills v. United States, 164 U.S. 644, 649, 17 S.Ct. 210, 41 L.Ed. 584 (1897); Frank v. United States, 220 F.2d 559, 565 (10 Cir. 1955); Smith v. United States, 230 F.2d 935, 939 (6 Cir. 1956), this is subject to an exception when the verdict gives assurance that no prejudice in fact occurred. United States v. Bottone, 365 F.2d 389, 394–95 (2 Cir.), cert. denied, 385 U.S. 974, 87 S.Ct. 514, 17 L.Ed.2d 437 (1966); United States v. Baratta, 397 F.2d 215, 225–26 (2 Cir.), cert. denied, 393 U.S. 939, 89 S.Ct. 293, 21 L.Ed.2d 276 (1968); United States v. Jacobs, 475 F.2d 270, 283–84 (2 Cir.), cert. denied sub nom., Lavelle v. United States, 414 U.S. 821, 94 S.Ct. 116, 38 L.Ed.2d 53 (1973). Here Count One charged not merely assault but, in order to trigger the heavier penalties provided by the second paragraph of § 111, assault "by use of a deadly and dangerous weapon, to wit, a revolver". In finding the defendants guilty of that charge, the jury necessarily found all the facts required for a conviction on the third count. It is thus immaterial that the jury may have considered the felony charged in Count Two also to have been a predicate.[14]

## IV. *Identification.*

The defendants claim the court erred in allowing Agent Shea to make in-court identifications of them[15]

---

14. Mere statement of defendants' other complaint, namely, that, although the judge had read the language of § 924(c) to the jury ("use of a firearm *to commit* any felony"), his later use of the phrase "used a firearm *in connection with*" the felonies charged in other counts constitutes "plain error" under F.R. Cr.P. 52(a), is sufficient refutation.

15. The court arranged to have other blacks seated with defendants at the counsel table. Counsel for Reid seems to suggest in his statement of the case that the district court somehow failed in its "responsibility" to assure that "additional persons of the same general size, build and coloration be seated at counsel table." Any such suggestion would reflect a

despite a previous impermissibly suggestive photographic identification.

On August 5, 1974, FBI agents advised Agent Shea that two men had been arrested in Ohio in possession of his service revolver. Two or three days later FBI agents showed him one photograph of each man, which had been taken in Ohio; he identified these as being photographs of his assailants.[16] No spreads of photographs were ever shown, and there was no line-up.

In its pretrial suppression hearing brief and again on appeal, the Government conceded that this procedure was impermissibly suggestive. While it surely was, we cannot accept the concession without further comment. If ever there was a case where failure to follow fair identification procedures was inexcusable, this was it. The suspects were in custody, the FBI could have had no doubt it had arrested the right men, and Shea was, happily, in no danger of death or disappearance. Compare Stovall v. Denno, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). We find it little short of incredible that, as the Assistant United States Attorney admitted at argument, in the six years since Simmons v. United States, 390 U.S. 377, 382–86, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), was decided, the Department of Justice should not have issued regulations with respect to photographic identifications by law enforcement agencies under its control. See ALI, A Model Code of Pre-Arraignment Procedure, § 160.1(2) (Tent. Draft No. 6, April 1, 1974). Apart from

the all important goal of avoiding misidentifications, continued use of a practice such as that here employed imposes a needless burden on the courts in endeavoring to answer the often nigh unanswerable question "whether, before the imprint arising from the unlawful identification procedure, there was already such a definite image in the witness' mind that he is able to rely on it at trial without much, if any, assistance from its successor." United States ex rel. Phipps v. Follette, 428 F.2d 912, 915 (2 Cir. 1970). See United States v. Wade, 388 U.S. 218, 241, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). It may result also in forcing courts to free men who are guilty of serious crimes and could readily have been proved to be if the law enforcement officers had behaved as the Supreme Court has instructed.

■■■■■■ While the quoted question often is difficult to answer, we have no doubt that Judge Conner correctly made an affirmative answer in this case. Agent Shea was a trained observer who had the strongest motivation to use his talents and entertained no doubt that he had done so effectively. While the time was short, he was at close range with the defendants in the store and the lighting, both in the store and on the street, was quite good. Importantly, and to the great credit of the prosecution and the district court, less than three months elapsed between the incident and the trial. Compare United States v. Wade, supra, 388 U.S. at 241, 87 S.Ct. 1926. Finally, the Polaroid photographs, both profiles, that had been shown to

misreading of the record. It is clear that defense counsel initially undertook to find such persons and, when counsel apprised the court of his inability to find anyone, the court sent a deputy clerk to try to find veniremen who resembled the defendants. Of the three the clerk found, counsel for Reid selected one and dismissed the other two. The individual selected sat at counsel table during the course of the proceedings. Counsel had ample opportunity to find persons resembling defendants for purposes of testing the in-court identification by Agent Shea which he knew would be proffered—something that was his responsibility and not that of the district judge. Moreover,

even if the venireman selected was not a close match for Reid, there is no requirement that even in line-ups the accused must be surrounded by persons nearly identical in appearance, however desirable that may be.

16. The defendants make some point of the fact that Shea's supervisor again showed him these photographs some three weeks before the trial; the Government answers, reasonably enough, that this viewing, of not more than five seconds, was necessary in order to make sure that the photographs being furnished to the defense in aid of defendants' pretrial discovery were the ones that Shea had seen.

Agent Shea were so indistinct, as the judge found, that they would add little to his previous opportunity for observation.[17]

Beyond all this, although we need not rely on it, is the fact that we know there was no misidentification here. This is clearly so with respect to Thomas; the presence of his glasses at the liquor store, of his fingerprints on the stolen Buick stationwagon, and of Shea's service revolver at the site of his apprehension in Ohio identified him as a perpetrator of the crime more solidly than the most unblemished identification testimony could have done. See 1 Wigmore, Evidence § 26 (3d ed. 1940). The circumstantial evidence concerning Reid is not quite that strong. But we know that there were two men in the store; that Reid was identified as the man who, with an unidentified accomplice stole the Pontiac, in which appellants were arrested, several days *before* the robbery; and that he had tried to get rid of Thomas' revolver in Ohio. The likelihood that he was the man who had been with Thomas in the liquor store was overwhelmingly greater than counsel's imaginative suggestion that he might have joined Thomas for an auto trip sometime between the assault and the arrest. We would not wish this discussion to be understood as implying that, if Agent Shea's in-court identification were tainted, its admission would have been harmless error because of this other evidence, cf. United States ex rel. Robinson v. Zelker, 468 F.2d 159, 165 (2 Cir. 1972), cert. denied, 411 U.S. 939, 93 S.Ct. 1892, 36 L.Ed.2d 401 (1973), although it very likely would have been with respect to Thomas and would have come close to being so with respect to Reid. Rather the rule in this circuit is that other evidence connecting a defendant with the crime may be considered on the issue whether there was a substantial likelihood of misidentifica-

tion. United States ex rel. Gonzalez v. Zelker, 477 F.2d 797, 803–04 (2 Cir.), cert. denied sub nom., Gonzalez v. Vincent, 414 U.S. 924, 94 S.Ct. 254, 38 L.Ed.2d 158 (1973); United States v. Bynum, 485 F.2d 490, 503–04 (2 Cir. 1973), vacated on other grounds, 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974).

The judgment of conviction is affirmed except that the convictions and sentences on Count Two are vacated and the district court is directed to dismiss that count.

MANSFIELD, Circuit Judge (concurring in part and dissenting in part):

I concur in Judge Friendly's characteristically thorough and scholarly opinion except for that portion which reverses defendants' convictions on Count 2 on the ground that § 2114 is "limited to crimes having a postal nexus." From this I must respectfully dissent. I would affirm the convictions on Count 2.

Section 2114 plainly prohibits defendants' conduct and is not limited to postal offenses. To reach the majority's view one must stand a well-established principle of legislative interpretation on its head. Although it has been observed, somewhat in jest, that some may have a tendency to "go to the statute" only "when the legislative history is doubtful," see Greenwood v. United States, 350 U.S. 366, 374, 76 S.Ct. 410, 415, 100 L.Ed. 412 (1956) (Frankfurter, J.), the recent decision of a panel of this court in United States v. Rivera, 513 F.2d 519 (2d Cir. 1975), relied upon by the majority, went to an even greater extreme. It substituted dubious legislative history for the plain, unambiguous language of the statute. Despite the suggestion by *Rivera* that the "plain meaning" doctrine of statutory interpretation of Caminetti v. United States, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1971), has become outmoded, it remains very much

---

**17.** Judge Conner gave the jury an extended and excellent charge with respect to what factors it ought to consider in evaluating in-court identifications, including the witness' opportunity to observe the defendant, lighting and other circumstances during the event, the witness' incentive to observe closely, and the possibility that photographs seen between the time of commission of the crime and the in-court identification may have affected the identification.

alive and viable. See, e.g., United States v. Oregon, 366 U.S. 643, 648, 81 S.Ct. 1278, 1281, 6 L.Ed.2d 575 (1961), where Justice Black, speaking for the Court, stated:

> "Having concluded that the provisions of § 1 are clear and unequivocal on their face, we find no need to resort to the legislative history of the Act. Since the State has placed such heavy reliance upon that history, however, we do deem it appropriate to point out that this history is at best inconclusive. It is true, as the State points out, that Representative Rankin, as Chairman of the Committee handling the bill on the floor of the House, expressed his view during the course of discussion of the bill on the floor that the 1941 Act would not apply to insane veterans incompetent to make valid contracts. But such statements, even when they stand alone, have never been regarded as sufficiently compelling to justify deviation from the plain language of a statute." [Footnotes omitted].

The proper time-tested procedure is first to consult the statute and be guided by its plain meaning, with resort to legislative history only when the statute appears ambiguous.

> "There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning." United States v. American Trucking Ass'ns, Inc., 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940). [Footnotes omitted].

See Browder v. United States, 312 U.S. 335, 338, 61 S.Ct. 599, 601, 85 L.Ed. 862 (1941), where the Court stated:

> "The plain meaning of the words of the act covers this use. No single argument has more weight in statutory interpretation than this." [Footnote omitted].

In accord, Addison v. Holly Hill Fruit Prods., Inc., 322 U.S. 607, 617–18, 64 S.Ct. 1215, 88 L.Ed. 1488 (1944).

As Justice Jackson stated in his concurrence in Schwegmann Bros. v. Calvert Corp., 341 U.S. 384, 395–96, 71 S.Ct. 745, 751, 95 L.Ed. 1035 (1951):

> "Resort to legislative history is only justified where the face of the Act is inescapably ambiguous, and then I think we should not go beyond Committee reports, which presumably are well considered and carefully prepared. I cannot deny that I have sometimes offended against that rule. But to select casual statements from floor debates, not always distinguished for candor or accuracy, as a basis for making up our minds what law Congress intended to enact is to substitute ourselves for the Congress in one of its important functions. The Rules of the House and Senate, with the sanction of the Constitution, require three readings of an Act in each House before final enactment. That is intended, I take it, to make sure that each House knows what it is passing and passes what it wants, and that what is enacted was formally reduced to writing. It is the business of Congress to sum up its own debates in its legislation."

See also Malat v. Riddell, 383 U.S. 569, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966); Commissioner of Internal Revenue v. Brown, 380 U.S. 563, 571–72, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965).

Section 2114 is not even slightly ambiguous. It plainly provides in clear and unequivocal language that "[w]hoever assaults *any* person having lawful charge, control, or custody of any mail matter *or of any money or other property of the United States,* . . . or robs *any such person* of mail matter, *or of any money, or other property of the United States*" (emphasis added) is guilty of a crime punishable by up to 10 years for the first offense and by a mandatory 25-year term if the custodian is wounded or has his life put in jeopardy by a dangerous weapon. If Congress had wanted to limit the offenses prohib-

ited by § 2114 to any assault on a postal employee or any assault upon a person holding money or other property in the custody of the United States Post Office, it surely knew how to do so. It has repeatedly enacted laws limited to offenses with respect to "mail," "letters" or "packets," 18 U.S.C. §§ 1693, 1694, 1695, 1696, 1698, 1700, 1701, 1703, a "post office or any authorized depository for mail matter," 18 U.S.C. § 1702, a "letter box," "mail receptacle" or "authorized depository for mail matter," 18 U.S.C. §§ 1705, 1708, "mail bags," 18 U.S.C. § 1706, "property used by the Post Office Department," 18 U.S.C. § 1707, "postal funds," 18 U.S.C. § 1711, a "letter or mail carrier," 18 U.S.C. § 1702, and a "postmaster" or "Postal Service Employee," 18 U.S.C. § 1709.

I share Judge Friendly's view that the 1948 transfer of § 2114 (formerly § 320) by the Reviser of the Criminal Code from the subdivision of the Code entitled "Offenses Against Postal Service" to Chapter 103, entitled "Robbery and Burglary," did not enlarge the scope of the statute, which had been enacted in 1935. At best it indicated that the Reviser may have believed that § 2114 reached beyond an assault on a postal employee or a custodian of postal property. But it is equally apparent that the earlier placement of the 1935 statute in the subdivision entitled "Offenses Against Postal Service," to which Judge Friendly attaches significance, did not restrict the scope of the statute. Indeed, prior to the 1948 revision, the Code did not have any subdivision classifying crimes in the broad generic terms later used in the 1948 revision (e.g., embezzlement, theft, extortion, gambling, homicide, fraud, rape, etc.), much less in the comprehensive and coordinated terms proposed by the National Commission on Reform of Federal Criminal Laws.[1] Thus prior to 1948 there was not a more general subdivision of the Code into which § 2114 (formerly § 320) could have been placed. It is significant, for instance, that prior to 1948 the statute making it a crime to kill various classifications of federal officers and employees, 18 U.S.C. § 253, now 18 U.S.C. § 1114, was to be found in Chapter 6, entitled "Offenses Against Public Justice," there being no chapter entitled "Homicide" until 1948.

Assuming that § 2114 was ambiguous, which it is not, and that resort to legislative history was permissible for the purpose of resolving the ambiguity, that history provides scant assistance to the majority. If anything, it reinforces the statute's plain unequivocal language. The majority relies heavily upon the statement of one Congressman, Donald C. Dobbins, on the floor of Congress, during debates on the bill, to the effect that its only purpose was to protect property in the custody of postal officials. See 79 Cong.Rec. 8205 (1935). If this was the sole purpose, one naturally asks why the bill did not so limit itself, like scores of statutes that are so limited. Aside from the failure to take this course, which would be immediately obvious to the least skillful of draftsmen, to attach controlling significance to one statement from floor debates, as Justice Jackson observed in Schwegmann Bros. v. Calvert Corp., *supra*, is a rather flimsy basis for interpretation. Indeed, an exchange which occurred on the floor between Congressmen Truax and Wolcott with respect to the bill on the same date evidences a desire to pass a broad bill. A suggestion by Mr. Truax that the bill should penalize the burglarizing of a person's home drew a rejoinder by Congressman Wolcott that for jurisdictional reasons "the bill is confined to assaults on Federal law-enforcement officers." 79 Cong.Rec. 8205 (1935).

1. The majority's suggestion that the Brown Commission's interpretation of § 2114 is in accord with that adopted by it does not bear scrutiny. Although the Commission (at p. 15) referred, in discussing jurisdictional bases for the federal criminal code, to § 2114 as dealing with mail, it later stated more accurately (p.

204) that § 2114 deals with "the mails, and other federal property." Furthermore, of course, § 2114 adds an offense not prohibited by § 2112, i.e., robbery that results in the infliction of a wound or that involves a dangerous weapon.

The Supreme Court has repeatedly stated that the authoritative source for interpretation of a statute lies in the committee report on the bill, which "represents the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation," Zuber v. Allen, 396 U.S. 168, 186, 90 S.Ct. 314, 324, 24 L.Ed.2d 345 (1969), as distinguished from the passing comments of one member, United States v. O'Brien, 391 U.S. 367, 385, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); Schwegmann Bros. v. Calvert Corp., *supra*, 341 U.S. at 395, 71 S.Ct. 745. Here the official reports of both the House and Senate Committees with respect to the bill disclose that, although the bill was introduced at the request of the Postmaster General and hence referred to the Committee on Post Offices and Post Roads of each House, both committees understood its purpose to be "to bring within the provisions of the Penal Code the crime of robbing or attempting to rob custodians of Government moneys." H.R.Rep. No. 582, 74th Cong., 1st Sess. (1935); Sen.Rep. No. 1440, 74th Cong., 1st Sess. (1935). The bill was described by the House Committee Report as one "*Safeguarding Custodians of Government Moneys and Property*" and by the Senate Committee Report as "*Providing for Punishment for the Crime of Robbing or Attempting to Rob Custodians of Government Moneys or Property.*" *Id.* Thus, although the immediate need for the bill may have arisen from a desire on the part of the Postmaster General to subject assaults on custodians of postal funds to the same penalty as those upon custodians of mail, it was recognized that an assault upon *any* custodian of *any* government property should be equally punishable. Indeed, even the letter of the Postmaster General referred to in the two committee reports stated in two places that the bill was designed to punish the crime of "robbing or attempting to rob custodians of Government moneys." *Id.* Thus neither the Postmaster General nor the two committees believed that the crime should be limited to postal employees or postal property.

Reading § 2114 according to its plain and unequivocal language serves the additional purpose of lending consistency to federal statutes dealing with the offense of violent robbery of a government employee. Under the majority's strained interpretation of § 2114, the violent attempted robbery of a person having custody of postal property would carry a mandatory 25-year sentence whereas the successful robbery of a person having custody of other government money or property would be punishable by a maximum of 15 years imprisonment under § 2112 or by a maximum of 10 years as an assault under § 111 (and then only if a "deadly or dangerous weapon" were used). This meaningless disparity would be eliminated by a holding that a violent robbery of a custodian of any *government* property (whether it be mail matter or other property) draws the same penalty.

Apparently the factor that was of most force in persuading the panel in *Rivera* to reach its interpretation of § 2114, which the majority here follows, was the position taken by the Solicitor General of the United States in United States v. Hanahan, 442 F.2d 649 (7th Cir. 1971), vac. & rem'd, 414 U.S. 807, 94 S.Ct. 169, 38 L.Ed.2d 43 (1973), to the effect that § 2114 was intended to be limited to "robberies of post offices or postal employees," which was promptly adopted by the Ninth Circuit in United States v. Fernandez, 497 F.2d 730 (9th Cir. 1974). Were we dealing with an interpretation of a statute or rule by a governmental agency based upon its highly specialized expertise in administering it, or an interpretation contemporaneous with the enactment of the statute or rule, the governmental agency's view might be entitled to considerable weight. Thompson v. Clifford, 132 U.S. App.D.C. 351, 408 F.2d 154, 166–67 (1968); see, e.g., Zuber v. Allen, *supra*, 396 U.S. at 192–94, 90 S.Ct. 314; Perine v. William Norton & Co., Inc., 509 F.2d 114, 120 (2d Cir. 1974); Soriano v. United States, 494 F.2d 681, 683 (9th Cir. 1974); Foremost Dairies, Inc. v. Wirtz, 381 F.2d 653, 659–60 (5th Cir. 1967), cert. denied sub nom., 390 U.S. 946, 88 S.Ct.

1031, 19 L.Ed.2d 1134 (1968). But, with due respect to the Solicitor General, he possesses no specialized or unusual knowledge about the language or history of § 2114 entitling his opinion to any special deference. Moreover, his interpretation follows by almost 40 years the amendment of § 2114 which concerns us here. The members of this court are in just as good a position as the Solicitor General to interpret the statute and need not defer to his construction when, as here, there are "compelling indications that it is wrong." Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969); see, e.g., Espinoza v. Farah Mfg. Co., 414 U.S. 86, 93–95, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973). For the reasons stated above his view is incorrect in this case, influenced as it apparently was by the harshness of the mandatory 25-year sentence called for by § 2114 as compared with the maximum 15-year term imposed for violation of § 2112. Undoubtedly this view was a strong influence in leading the *Fernandez* court into error. Sensing that it could not rely upon legislative history to interpret an unambiguous statute, the Ninth Circuit in *Fernandez* solved the problem by labelling § 2114 "ambiguous." A fair reading of the statute, however, discloses that it is not in the least bit ambiguous.