05-4339-pr
Brisco v. Ercole

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term, 2006

(Argued: January 11, 2007                    Decided: May 13, 2009)

Docket No. 05-4339-pr

FRANK BRISCO,

     *Petitioner-Appellee,*

  v.

ROBERT ERCOLE, Superintendent of Green Haven Correctional Facility,

     *Respondent-Appellant.*

Before: WINTER and CABRANES, *Circuit Judges*, and KORMAN, *District Judge.*[*]

     Appeal from a judgment of the United States District Court for the Eastern District of New York (Arthur D. Spatt, *Judge*) granting petitioner's application for a writ of habeas corpus on the ground that an unnecessarily suggestive eyewitness identification procedure created a substantial likelihood of misidentification of the petitioner. We reverse the judgment of the District Court and conclude that the petition must be denied. Petitioner has failed to establish that the state court's decision was "an unreasonable application of[ ] clearly established federal law" within the meaning of 28 U.S.C. § 2254(d)(1).

     Judge Korman concurs in a separate opinion.

                     GUY ARCIDIACONO, Assistant District Attorney (Thomas J.
                        Spota, District Attorney of Suffolk County, *on the brief*),

---

[*] The Honorable Edward R. Korman, United States District Judge for the Eastern District of New York, sitting by designation.

Riverhead, New York, *for Respondent-Appellant.*

SALLY WASSERMAN, New York, NY, *for Petitioner-Appellee.*

JOSÉ A. CABRANES, *Circuit Judge*:

Respondent Robert Ercole, Superintendent of Green Haven Correctional Facility, appeals from a judgment of the United States District Court for the Eastern District of New York (Arthur D. Spatt, *Judge*) granting petitioner Frank Brisco's application for a writ of habeas corpus. Brisco was arrested for burglary after he was identified by the crime victim in a "showup" identification that took place approximately one hour after the crime was committed. Following the denial of his pretrial motion to suppress the showup identification in a New York state trial court, Brisco pleaded guilty to attempted burglary but preserved his right to appeal pretrial rulings. The Appellate Division and the New York Court of Appeals affirmed the suppression ruling on direct appeal. In federal habeas proceedings, the District Court concluded that: (1) the pretrial eyewitness identification procedure was unnecessarily suggestive; (2) the identification was not independently reliable; and (3) it was an unreasonable application of clearly established federal law for the state court to conclude that, had there been a trial, the admission of the identification would have comported with due process. *Brisco v. Phillips*, 376 F. Supp. 2d 306, 319-21 (E.D.N.Y. 2005) ("*Dist. Ct. Op.*").

We reverse the judgment of the District Court and deny the petition because Brisco failed to establish that the state court's decision was "an unreasonable application of[ ] clearly established federal law" within the meaning of 28 U.S.C. § 2254(d)(1).

## BACKGROUND

### A.     Factual Overview[1]

On July 6, 1999, at 11:30 a.m., Suffolk County Police Detective Brian McNeil responded to a

---

[1] Other than where specifically noted, we adopt the District Court's account of the facts. *See Dist. Ct. Op.*, 376 F. Supp. 2d at 308-10.

report of a burglary at 51 Mills Pond Road in St. James, New York.  The complainant was Augusta

Kemper, a seventy-eight-year-old woman, who called the police that morning when she encountered a

burglar fleeing her property.  Kemper described the suspect as a white male in his twenties,

approximately 5 feet 10 inches tall, well-built, "stocky," having brown hair, and wearing maroon shorts

with no shirt.  She also reported that the man had fled north.

Approximately twenty minutes later, at 11:50 a.m., Officers Brian Holtje and Thomas Bafundo

received a report of the crime over police radio, and they arrived within five minutes at the scene in

their patrol car.  After briefly conferring with Detective McNeil, officers Holtje and Bafundo canvassed

the neighborhood by car.

Less than a tenth of a mile north (the direction in which the suspect fled) of the crime scene the

officers noticed a house at 66 Mills Pond Road with the front door apparently open.[2]  The house

appeared to be under renovation.  Officer Holtje approached the front of the house and knocked on a

closed door behind the open front door.  Meanwhile, Officer Bafundo went to the back, where he saw

a swimming pool and a man inside the house wrapping himself in a towel.  When Officer Holtje

knocked a second time, a wet-haired man wearing a towel answered and identified himself as Frank

Brisco.  Unbeknownst to the officers at the time, Brisco had a long history of theft crimes on Long

Island, including four prior convictions for burglary, attempted burglary, and robbery.

Officer Holtje observed that Brisco was approximately thirty years old[3] and was not visibly

nervous during their initial conversation.  Brisco told the officers that the house belonged to his sister

and that he and his friend were renovating the bathroom.  After this brief conversation, both officers

---

[2] One of the officers testified that, in his judgment, the two houses were separated by a distance of between 1000 and 1500 feet (less than a third of a mile), and this was the distance recorded in the District Court's opinion.  *See Dist. Ct. Op.*, 376 F. Supp. 2d at 308.  Nevertheless, we take judicial notice that 51 and 66 Mills Pond Road are in fact less than a tenth of mile apart.  *See, e.g.*, Yahoo! Local Maps, http://maps.yahoo.com.

[3] In fact, Brisco was thirty-eight at the time.

3

returned to their patrol car. Shortly after leaving the house, Officer Holtje reflected that it was suspicious that Brisco answered the door in a towel even though he had claimed that he was at the house to renovate the bathroom.

At approximately 12:10 p.m.—forty minutes after the burglary report—Officers Holtje and Bafundo returned to 66 Mills Pond Road accompanied by Detective McNeil. They knocked on the door and Brisco answered, this time wearing a pair of tan shorts and no shirt. Brisco talked to the policemen in the kitchen. Another person in the house, Brian McGraff, was working in the bathroom. Detective McNeil told Brisco that there had been a burglary in a house down the street. The detective asked him where he had been that morning and Brisco replied that he had not left his sister's house. As the four men conversed in the kitchen, one of the officers noticed a wet pair of maroon shorts on the floor of an adjoining bedroom. He asked Brisco if the shorts were his, and Brisco responded affirmatively. Detective McNeil then asked Brisco to go down the street with the officers "to see if someone could recognize him [in] reference to the burglary." *Dist. Ct. Op.*, 376 F. Supp. 2d at 309. Brisco agreed, and Detective McNeil took the maroon shorts with him without objection from Brisco. Brisco was then seated in the back of the police car and driven to the scene of the burglary.

The detective, the two police officers, and Brisco returned to the crime scene at approximately 12:25 p.m., slightly less than one hour after the officers received the initial report from Kemper. Brisco exited the police car and stood at the bottom of the driveway, at a distance between fifteen and fifty feet from Kemper's house. Brisco was still wearing tan shorts and no shirt. He was not handcuffed. Detective McNeil went inside the house and spoke with Kemper. Another uniformed officer, Christine Ward, joined officers Holtje and Bafundo, and together with Brisco they waited in front of the house.

After ten to fifteen minutes, Detective McNeil went back outside and retrieved the wet maroon shorts from the patrol car. McNeil asked Brisco to take the shorts; Brisco complied with the request,

4

holding the shorts in his hands at waist level, just next to his hip. At the time he held up the shorts, three uniformed police officers were standing in close proximity to Brisco and three police vehicles were parked behind him. That said, Brisco had accompanied the officers to Kemper's house voluntarily and—according to the officers—would have been allowed to leave if he had asked to do so.[4] At this time, McNeil returned to the house, brought Kemper to the front window, and asked her to look outside to see if she recognized anyone. Kemper identified Brisco as the burglar and identified the maroon shorts as those worn by the burglar. Brisco was then asked to go to the precinct, where he was questioned and subsequently released. Three days later, Brisco was arrested and later indicted for one count of Burglary in the Second Degree and one count of Petit Larceny.

## B.     Procedural History

Prior to trial, Brisco moved to suppress Kemper's eyewitness identification of him. A *Wade* hearing was held on March 28, 2000 in New York State Supreme Court to assess whether Kemper's identification of him should be suppressed because the procedure was unnecessarily suggestive. *See United States v. Wade*, 388 U.S. 218 (1967). Holtje, Bafundo and McNeil testified at the *Wade* hearing. McNeil testified with respect to the manner in which the identification was made:

Q.  After giving the shorts to the defendant in the driveway of 51 Mills Pond Road, did you go back into the house?

A.  Yes, I did.

Q.  And what did you do at that time?

A.  I had [Kemper] look out the window of the house to see if she would recognize anyone.

Q.  When you went back into the house, after giving the defendant the shorts from your car, was [Kemper] in the back of the house or the front?

---

[4] The District Court did not refer to these findings of fact by the state trial court in its decision granting Brisco's habeas petition.

5

A. Yes, she was. I went to the rear of the house and brought her to the front room.

Q. And what did you say to her when you brought her to the front room?

A. I asked her if she recognized anyone standing outside.

Q. Do you remember if [Kemper] said anything when she viewed the defendant at this time?

A. Yes, she looked at the subject standing outside, and she stated that this is the person that she saw leaving the house, and that he was the same height, color hair, build, and she also identified the shorts that he was holding.

Q. And she identified those shorts that he was holding as what?

A. As the shorts that she saw the individual wearing that was inside her house when the burglary occurred.

*Dist. Ct. Op.*, 376 F. Supp. 2d at 309-10 (*quoting* Mar. 28, 2000 Hr'g Tr. at 123-24). Brisco did not testify at the *Wade* hearing, nor did he call any witnesses on his behalf.

By written order and decision dated April 10, 2000, the judge who presided over the *Wade* hearing held that the showup "was not unduly suggestive" because: (1) it was conducted promptly, within a short time after the commission of the crime; (2) it was conducted at the crime scene; (3) Brisco was not singled out by the police; and (4) he was not in police custody at the time. *People v. Brisco*, No. 1662-99, slip op. at 2 (N.Y. Sup. Ct. Suffolk County Apr. 10, 2000). Afterward, Brisco pleaded guilty to one count of attempted burglary in return for a plea-bargained sentence of twelve years to life as a "persistent violent felony offender," *see* N.Y. Penal Law § 70.08, but reserved his right to appeal.

On direct appeal, the Appellate Division affirmed the denial of the suppression motion, noting that (1) Brisco was not handcuffed at the time of the showup, (2) the police did not tell Kemper that they had located a suspect, and (3) the showup was conducted in close temporal and geographical proximity to the crime scene. *See People v. Brisco*, 292 A.D.2d 626, 626 (2d Dep't 2002). The Court

6

concluded that it was not improper for Brisco to display the maroon shorts at his waist during the showup identification. *See id.* at 627. One justice dissented, arguing that the identification procedure was rendered unnecessarily suggestive when the police required Brisco to hold up a pair of shorts that were the same color as those described by the complainant. *See id.* at 629 (Goldstein, J., dissenting).

Petitioner was then granted leave to appeal to the New York Court of Appeals. In a brief memorandum opinion, it held:

> [The] record evidence supports the conclusion that the procedures used were reasonable under the circumstances. The showup took place at the scene of the crime, within an hour of the commission of the crime, and in the context of a continuous, ongoing investigation. Record evidence also supports the conclusion that the showup identification was not unduly suggestive. The victim stated that defendant was the person whom she had seen leaving her house, and initially and independently identified him relying on his height, hair color, and build. In these circumstances, the presence of defendant's maroon shorts, admittedly his own, did not, as a matter of law, negate the reasonableness of the police action.

*People v. Brisco*, 99 N.Y.2d 596, 597 (2003). One judge dissented on the grounds that (1) there were no exigent circumstances that would render a showup, which is "inherently suggestive," a necessary part of the police investigation; and (2) the circumstances of the showup—especially that Brisco appeared shirtless and flanked by uniformed police officers with patrol cars in the background—"created a substantial likelihood of misidentification." *Id.* at 599, 602 (G. B. Smith, J., dissenting).

Brisco then filed a petition for a writ of habeas corpus in the District Court pursuant to 28 U.S.C. § 2254. The District Court concluded that (1) the circumstances of the nascent police investigation did not create a need or exigency to justify a showup, as opposed to a lineup or some other means of identification, and (2) the circumstances of the showup itself were "highly" and "impermissibly suggestive." *Dist. Ct. Op.*, 376 F. Supp. 2d at 314-15. Next, it found that the identification was not independently reliable. *See id.* at 315-19. Finally, the District Court held that the state court's decision represented "an unreasonable application of[ ] clearly established [f]ederal law"

7

pursuant to 28 U.S.C. § 2254(d)(1). *See id.* at 319-21. Accordingly, it granted the petition, ordered the pretrial identification suppressed, and directed that Brisco be tried or released. *See id.* at 321. The District Court stayed its ruling pending appeal. *See id.*

This appeal followed.

## DISCUSSION

### A.      Standard of Review

We review *de novo* a district court's decision to grant a writ of habeas corpus. *See, e.g., Gersten v. Senkowski*, 426 F.3d 588, 606 (2d Cir. 2005).

Our review of habeas petitions filed pursuant to § 2254 is governed by standards set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214. *See Messiah v. Duncan*, 435 F.3d 186, 196-98 (2d Cir. 2006). As we observed in *Hoi Man Yung v. Walker*, 468 F.3d 169, 176 (2d Cir. 2006):

> Under AEDPA, a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). We must presume the state court's factual findings to be correct and may overturn those findings only if the petitioner offers "clear and convincing evidence" of their incorrectness. 28 U.S.C. § 2254(e)(1).

Brisco does not argue that the state court's decision was "contrary to . . . clearly established [f]ederal law," 28 U.S.C. § 2254(d)(1), nor does he argue that the state court's decision denying his suppression motion "was based on an unreasonable determination of the facts in light of the evidence" presented at the *Wade* hearing, *id.* § 2254(d)(2). Instead, he argues—and the District Court concluded—that the state court's decision satisfied the "unreasonable application" prong of § 2254(d) ("An application for a writ of habeas corpus . . . shall not be granted with respect to any claim that was

8

adjudicated on the merits in [s]tate court proceedings unless the adjudication of the claim . . . resulted in a decision that . . . involved an unreasonable application of[ ] clearly established [f]ederal law, as determined by the Supreme Court of the United States.").[5] *See Dist. Ct. Op.,* 376 F. Supp. 2d at 321. A decision involves an "unreasonable application" of clearly established federal law if, *inter alia*, the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 407-08 (2000); *Yung*, 468 F.3d at 176. In this context, the Supreme Court has explained that "clearly established [f]ederal law . . . refers to the holdings, as opposed to the dicta, of th[e] Court's decisions as of the time of the relevant state-court decision." *Carey v. Musladin*, 549 U.S. 70, 74 (2006) (internal quotation marks omitted).

A federal habeas court cannot issue the writ simply because that court concludes, in its independent judgment, that the state court "applied clearly established federal law erroneously or incorrectly," *Williams*, 529 U.S. at 411; conflating "unreasonableness" with "clear error" is improper because "[t]he gloss of clear error fails to give proper deference to state courts." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). We have also held, however, "that the increment [of error beyond clear error] need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks omitted).

## B.      Constitutional Standards for the Admission of Eyewitness Identifications

In order to determine whether the state court's decision constituted an unreasonable application of clearly established federal law, we must first survey the well-established federal law regulating the

---

[5] There is no dispute that Brisco's challenge to the identification procedure, which was the subject of a decision of the New York Court of Appeals, was "adjudicated on the merits." *Id.* § 2254(d). Moreover, respondent does not dispute that Brisco could seek habeas relief, despite his guilty plea, pursuant to the holding of the Supreme Court in *Lefkowitz v. Newsome* that a criminal defendant who preserved his right to appeal a pretrial ruling in state court also preserved his right to seek habeas relief in federal court on the basis of that preserved pretrial ruling. 420 U.S. 283, 289-91 (1975).

introduction of eyewitness identification testimony at criminal trials. Reliability is the touchstone for admission of eyewitness identification testimony pursuant to the Due Process Clause of the Fourteenth Amendment. *See Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001). As we explained in *Raheem*, our inquiry into the reliability of eyewitness identifications proceeds in two stages:

> The court must first determine whether the pretrial identification procedures unduly and unnecessarily suggested that the defendant was the perpetrator. If the procedures were not suggestive, the identification evidence presents no due process obstacle to admissibility; no further inquiry by the court is required, and the reliability of properly admitted eyewitness identification, like the credibility of the other parts of the prosecution's case is a matter for the jury. If the court finds, however, that the procedures were [unnecessarily] suggestive, it must then determine whether the identification was nonetheless independently reliable. In sum, the identification evidence will be admissible if (a) the procedures were not [unnecessarily] suggestive or (b) the identification has independent reliability.

*Id.* (internal citations, quotation marks and alterations omitted); *see also id.* at 134 (discussing whether evidence was "unduly" or "unnecessarily" suggestive).

Under the first step of this analysis, an identification procedure may be deemed unduly and unnecessarily suggestive if it is based on police procedures that create "a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). While a "showup" procedure is inherently suggestive because it involves the presentation of a single suspect to a witness by the police (as opposed to a lineup, in which several individuals are presented to the police, only one of whom is the suspect), and has accordingly been "widely condemned," *Stovall v. Denno*, 388 U.S. 293, 302 (1967), "a claimed violation of due process in the conduct of a confrontation depends on the totality of the circumstances surrounding it," *id.* Accordingly, a showup identification violates due process only if it is an "*unnecessarily* suggestive" procedure. *Id.* (emphasis added).

Exigent circumstances generally weigh in favor of concluding that a showup identification procedure was not unnecessarily suggestive, because a showup procedure may be necessary in such circumstances to quickly confirm the identity of a suspect, or to ensure the release of an innocent

10

suspect. *See, e.g.*, *id.* (concluding that suggestive showup identification procedure did not violate due process because sole eyewitness to crime was at risk of dying and was unable to travel from her hospital bed to police station for lineup); *United States v. Bautista*, 23 F.3d 726, 730 (2d Cir. 1994) (Oakes, J.) ("[A] prompt showing of a detained suspect at the scene of arrest has a very valid function: to prevent the mistaken arrest of innocent persons." (internal quotation marks omitted)). Thus, we have instructed that where an officer has "or should have doubts whether a detained suspect is in fact the person sought, the officer must make 'immediate reasonable efforts to confirm the suspect's identity,'" *id.* (*quoting United States v. Valez*, 796 F.2d 24, 27 (2d Cir. 1986)), and we have held that identification evidence from showups held in close temporal and geographic proximity to the crime scene may be admitted, *see, e.g.*, *Bautista*, 23 F.3d at 731; *United States ex rel. Cummings v. Zelker*, 455 F.2d 714, 716 (2d Cir. 1972) (holding that showup procedure was necessary to insure "the immediate release of an innocent suspect and at the same time to enable the police to resume the search for the fleeing culprit while the trail [was] still fresh").

Even if an identification procedure is unduly suggestive, the out-of-court identification may nonetheless be admissible if other factors indicate that the identification is independently reliable. To ascertain whether an identification "has reliability independent of the unduly suggestive identification procedures," *Raheem*, 257 F.3d at 135, courts generally look to five established factors, first set forth in *Neil v. Biggers*:

> [1] the opportunity of the witness to view the criminal at the time of the crime,
> [2] the witness' degree of attention,
> [3] the accuracy of the witness' prior description of the criminal,
> [4] the level of certainty demonstrated by the witness at the confrontation, and
> [5] the length of time between the crime and the confrontation.

409 U.S. 188, 199-200 (1972); *see also Manson v. Brathwaite*, 432 U.S. 98, 114 (1977). None of these factors standing alone is dispositive of the existence of independent reliability; instead, reliability is

11

assessed "in light of the totality of the circumstances." *Raheem*, 257 F.3d at 135.

## C. The State Court's Application of Clearly Established Federal Law Governing the Admission of Eyewitness Identifications Was Reasonable.

Applying the standards outlined in the previous sections to the issue raised in Brisco's petition, we hold that it was a reasonable application of clearly established federal law for the New York Court of Appeals[6] to conclude that the challenged showup procedure was not unnecessarily suggestive.

Our determination of whether a court has unreasonably applied a legal standard depends in large measure on the specificity of the standard in question. This is so because "[a]pplying a general standard to a specific case can demand a substantial element of judgment," *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004), while a standard defined with exacting specificity can be implemented almost mechanically. For that reason, "[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id.*

The determination of whether an identification procedure violates due process is governed by an extraordinarily general standard that hews closely to the facts of a particular case and turns on a court's judgment in evaluating those facts. *See, e.g.*, *Simmons*, 390 U.S. at 384 (declining to impose a blanket prohibition on a specific identification procedure and holding instead that "each case must be considered on its own facts"). As noted above, this standard calls for an evaluation of "the totality of the circumstances," *Stovall*, 388 U.S. at 302, in order to determine whether an identification procedure unnecessarily creates "a very substantial likelihood of irreparable misidentification," *Simmons*, 390 U.S. at 384. Pursuant to this standard, a court must identify the circumstances giving rise to the procedure, gauge the exigencies that the circumstances entailed, determine whether the identification procedure was warranted under the circumstances, and decide whether the suggestiveness was so severe that it

---

[6] *See, e.g.*, *Williams v. Taylor*, 529 U.S. 362, 371 (2000) (reviewing the decision of the Virginia Supreme Court, the highest state court to consider petitioner's § 2254 petition).

12

produced irreparable damage. This fact-dependent standard "demand[s] a substantial element of judgment," *Yarborough*, 541 U.S. at 664, in its application. A court applying this standard to the facts of a specific case is therefore entitled to significant "leeway" when we review its decision for reasonableness. *Id.*

The "clearly established [f]ederal law," 28 U.S.C. § 2254(d)(1), at issue in Brisco's appeal is a fairly inclusive standard—whether an identification was "unnecessarily suggestive," *Stovall*, 388 U.S. at 302, and created a "a very substantial likelihood of irreparable misidentification," *Simmons*, 390 U.S. at 384. In light of this permissive standard, and the leeway to which courts are entitled under *Yarborough*, 541 U.S. at 664, we cannot conclude that the decision of the New York Court of Appeals was an unreasonable application of clearly established federal law. New York's highest court rejected Brisco's challenge to the identification procedure on two grounds. First, the court concluded that "the [identification] procedure[ ] used w[as] reasonable under the circumstances" because it "took place at the scene of the crime, within an hour of the commission of the crime, and in the context of a continuous, ongoing investigation." *Brisco*, 99 N.Y.2d at 597. The circumstances of the ongoing investigation, in the court's view, made the procedure reasonable. Second, the Court of Appeals concluded that the identification procedure was not "unduly suggestive," because Kemper, the eyewitness, "initially and independently identified [Brisco,] relying on his height, hair color, and build." *Id.* Kemper's reference to Brisco's physical traits—and not the maroon shorts—confirmed to the Court of Appeals that the procedure was not unduly suggestive.

In light of our own decisions affirming the admission of identifications obtained through similar procedures and under similar circumstances, we see no basis to conclude that the decision of the New York Court of Appeals to deny Brisco's challenge was unreasonable. A comparison of this case with our decision in *Bautista*, 23 F.3d 726, is instructive. In *Bautista*, the following showup identification

13

procedure occurred shortly after a drug raid: a series of suspects "w[ere] presented [individually] . . . in handcuffs [to the eyewitness]; at night; in the custody of police officers; with [their] face[s] lit by flashlights; and in the presence of [a police officer] who, each time the [eyewitness] identified a suspect, radioed to his fellow officers, 'it's a hit.'" 23 F.3d at 730. On direct appeal from his conviction in the district court, one of the defendants argued that the showup procedure was unnecessarily suggestive. We disagreed. Judge Oakes, writing for the Court, concluded that

> [t]he fact that the suspects were handcuffed, in the custody of law enforcement officers, and illuminated by flashlights also did not render the pre-trial identification procedure unnecessarily suggestive. In this case, handcuffs, custody, and flashlights were all necessary incidents of an on-the-scene identification immediately following a night-time narcotics raid. Because the on-the-scene identification was necessary to allow the officers to release the innocent, the incidents of that identification were also necessary.

*Id.* Indeed, we stated that "rather than excoriate the law enforcement officials involved for conducting an unduly suggestive procedure, one might commend them for their immediate efforts to ascertain and release innocent people." *Id.* at 730 n.6.

Like *Bautista*, the showup here was of course suggestive, but it is not unreasonable for the state courts to have concluded that it was not *unnecessarily* suggestive. In *Bautista*, we "instructed law enforcement officials that where an officer has or should have doubts whether a detained suspect is in fact the person sought, the officer must make immediate reasonable efforts to confirm the suspect's identity." *Id.* at 730. This instruction supported the use of a showup identification procedure to immediately confirm the identity of the detained suspects in *Bautista*. Here, the procedure enabled the officers to determine whether they "had their man" while the witness's memory was still fresh and while the maroon shorts were still available as evidence. In the event that their suspicions were confirmed by the eyewitness, the showup would allow the officers to determine whether to seize the

14

shorts and avoid wasting police resources on a search for other suspects.[7] Absent an immediate showup of Brisco and an identification of the shorts, probable cause to seize the shorts was in doubt, leaving the officers open to substantial and legitimate criticism if the shorts later disappeared. If no identification was made at the showup, the officers could resume their search for the offender. In this case, as in *Bautista*, the officers undertook immediate, reasonable efforts to confirm Brisco's identity and identify the shorts by conducting a showup identification procedure.

In light of our approval—on direct review—of a showup that (1) took place under similarly suggestive circumstances and (2) presented the same need for rapid verification by an eyewitness, we cannot say—on habeas review—that the decision of the New York Court of Appeals was "an unreasonable application of[ ] clearly established [f]ederal law." 28 U.S.C. § 2254(d)(1).

Every state court that considered this matter found the showup to be untainted by the alleged suggestiveness of the circumstances attending Kemper's identification of Brisco, and these courts therefore paid little or no attention to the *Biggers* factors going to overall reliability. Because the District Court found the showup to be unnecessarily suggestive, it, unlike the state courts, reached and discussed the *Biggers* factors at length, concluding that the identification was unreliable. Even assuming *arguendo* that the showup was unnecessarily suggestive, we respectfully disagree that the identification was unreliable.

With regard to Kemper's opportunity to view the perpetrator and her degree of attention—the first two *Biggers* factors—the District Court was hampered, as are we, by the parties' failure to explore in the state court hearing the initial encounter in which Kemper viewed the burglar. The District Court concluded that there was, therefore, "no available indicia of reliability," *Dist. Ct. Op.,* 376 F. Supp. 2d at

---

[7] It is significant that a short period of time elapsed between Kemper's report of the burglary and the showup in front of Kemper's home. Had the showup occurred hours—or days—after the report, the prompt determination of whether Kemper could identify Brisco would have been less important to the efficacy of the investigation.

15

316, as to these factors. However, there is no presumption that an eyewitness who gives a description had an inadequate opportunity to observe the elements that make up that description. In the normal course, an eyewitness can be expected to describe details to the extent that he or she was able to observe them. With regard to degree of attention, viewing an uninvited stranger leaving one's house is likely to attract close attention.

The District Court found the third *Biggers* factor, the accuracy of the prior description, to weigh against the prosecution because none of the various age descriptions fit Brisco—eighteen or twenty, or in his twenties, as against thirty-eight—and because McGraff, the other person in the house where Brisco was found, also fit the overall description but attracted "absolutely no suspicion" on the officers' part. *Dist. Ct. Op.,* 376 F. Supp. 2d at 316. We reach the opposite conclusion. The physical description provided by the victim substantially matched petitioner's characteristics insofar as Brisco is a white male, 5 feet 8 inches tall, "stocky," and has brown hair. *See id.* at 316; Mar. 28, 2000 Hr'g Tr. at 62. Brisco was also found with a pair of maroon shorts, which he acknowledged belonged to him and which appeared to have been recently worn by him. While he had put on a different pair of shorts of a different color by the time he was asked to go the crime scene, he was not wearing a shirt; so his manner of dress corresponded to the victim's description of the perpetrator.

The District Court concluded that it was "very telling," *Dist. Ct. Op.,* 376 F. Supp. 2d at 316, that the initial reports stated that the perpetrator was either eighteen to twenty years old or in his twenties, while Brisco was, in fact, thirty-eight at the time of his arrest. We do not ascribe the same weight to this discrepancy because, as a general matter, "witnesses' powers of observation [are] greater than their powers of description," *Mysholowsky v. New York*, 535 F.2d 194, 198 (2d Cir. 1976), and age can be a particularly difficult characteristic to describe accurately. In addition, the accuracy of Kemper's description is bolstered by the testimony of one of the officers that Brisco appeared to be

16

thirty years old, younger than his actual age.  There is a variance, therefore, but not of fatal significance.[8]  Finally, there is nothing out of the ordinary in the decision of the officers not to view McGraff as a suspect in light of their observation that McGraff was "sort of pouchy . . . [and not] a well-built person," a body type inconsistent with Kemper's description of the perpetrator as "well-built."  We conclude therefore that this discrepancy alone is insufficient to undermine the accuracy of Kemper's prior description of the perpetrator.  *See Dunnigan v. Keane*, 137 F.3d 117, 130 (2d Cir. 1998) (the reliability of the identification was not undermined by the fact that the initial description of the suspect was that he was in his mid-twenties while the defendant was in fact in his mid-thirties).

With regard to Kemper's "level of certainty"—the fourth *Biggers* factor—the District Court found this favored Brisco because she was seventy-eight years old, and was fifteen to fifty feet from Brisco when she identified him and the shorts.  *See Dist. Ct. Op.,* 376 F. Supp. 2d at 316.  The court concluded that, without the shorts, Kemper "may have come to a different conclusion."  We disagree.  The District Court's conclusion is based entirely on speculation.  Elderly people are not necessarily unable to observe, or to describe people and events.  Moreover, fifteen to fifty feet is hardly a great distance.

We also do not share the District Court's wariness of Brisco's holding the maroon shorts at the time of the identification.  *See Dist. Ct. Op.*, 376 F. Supp. 2d at 315.  To be sure, the shorts added to the level of certainty but in a very legitimate way.[9]  Brisco's holding of the maroon shorts singled him out as the suspected burglar only if Kemper was also able to identify the shorts as the ones seen on the burglar. Underlying Brisco's arguments and the District Court's concerns regarding the shorts is, therefore, the assumption that because they were indeed the shorts worn by the burglar, their presence increased the

---

[8] Similar confusion surrounds McGraff's age, which the officers variously described as twenty and forty.

[9] It might have been preferable to present Brisco and the shorts separately.  However, the suggestiveness of the showings would not have been reduced by a different presentation, and we see little heightened chance of Kemper's misidentifying both the shorts and Brisco as a result of the actual presentation.

17

chance that Kemper would identify Brisco as the perpetrator. But the presence of the shorts offered an opportunity either to double check Brisco's guilt or to exculpate him. Shorts come in different styles and lengths, and there are varying shades of maroon. Indeed, the shorts in question were referred to at the hearing as dark brown as well as maroon. There was no guarantee that Kemper would identify the shorts, and, while the presence of the shorts certainly reinforced the already conspicuous suspicions of the officers as to Brisco, her identification of them adds to, rather than detracts from, the reliability of her identification of Brisco.

The District Court also determined that defense counsel's lack of an opportunity to cross-examine Kemper provided another basis to conclude that the level-of-certainty factor favored Brisco. *See Dist. Ct. Op.,* 376 F. Supp. 2d at 316. The state court evidentiary hearing focused exclusively on evidence regarding the suggestiveness of the showup. It dealt with the circumstances surrounding the police encounters with Brisco at 66 Mills Pond Road and the subsequent identification of Brisco by Kemper. It did not explore Kemper's viewing of the burglar at the time of the crime or the *Biggers* factors going to reliability. The three officers were called as witnesses because they were the officers who were involved in bringing Brisco to Kemper's house for identification. Brisco's counsel was content with these limited proceedings and chose deliberately neither to call witnesses nor probe the *Biggers* factors. Brisco's counsel was content to leave inquiries as to the independent reliability of the identification under *Biggers* to a later time, if and when Kemper was called as a witness to make an in-court identification, as reflected in the following colloquy.

> MS. SCARPATI: Your Honor, I'd just like to point out, with regards to the show-up, that if in fact the Court does allow this to come into evidence, that it's suggested, really there's no independent, I believe, source that Ms. Kemper, should she come in here and testify at a later date at a trial, be able to identify Mr. Brisco, in light of what the police officers and Det. McNeil had suggested, and I would ask that if Ms. Kemper came forward and did testify at a subsequent trial, that she be precluded from offering any evidence pointing out the defendant as the individual.
>
> THE COURT: Unless there was an independent source hearing prior to the trial or during the

18

trial itself.  Yes?

MS. SCARPATI: Okay.  As the Court knows, I will be making various motions after this, because of the time frame.

Mar. 28, 2000 Tr. 151-52.  This was hardly an unreasonable choice.  Pursuit of evidence regarding the *Biggers* factors risked bolstering the state's case and a ruling that might lead to the admission of the showup identification corroborated by an in-court identification, leaving Brisco with no avenues of defense or plea bargaining leverage well before trial.[10]

The final *Biggers* factor—the time between the crime and identification—weighs against Brisco. The identification was made an hour and ten minutes after the burglary, while the events and appearance of the burglar were fresh in Kemper's mind and well within permissible time frames established in our cases.  *See, e.g.*, *United States v. Salameh*, 152 F.3d 88, 125-26 (2d Cir. 1998) (approximately one week); *Dunnigan v. Keane*, 137 F.3d 117, 129 (2d Cir. 1998) (three days); *Gonzalez v. Hammock*, 639 F.2d 844, 848 (2d Cir. 1980) ("about one hour").  Even if the showup was unnecessarily suggestive, therefore, we conclude that the *Biggers* factors favor the state and that the showup identification was independently reliable.

While we reach this conclusion based on the five specific factors prescribed in *Biggers*, these factors do not necessarily exhaust the possible ways in which identification evidence may prove to be reliable or unreliable.  Indeed, the Supreme Court was careful to say that the factors to be considered "include" the five named ones.  *See Manson*, 432 U.S. at 114; *Biggers*, 409 U.S. at 199.  Thus, "[t]o say that the general due process standard established in *Manson* [and *Biggers*] must be applied to the identification

---

[10] As discussed above, the federal constitutional right to exclude an eyewitness identification (and subsequent in-court identification) requires findings of both unnecessary suggestiveness and a failure to meet the *Biggers* test.  Brisco and, evidently, the prosecution chose to leave the *Biggers* issue to a later hearing that became unnecessary when Brisco pleaded guilty.  Only one of the two issues that had to be resolved in his favor was, therefore, litigated in the state proceedings.  Because we decide that the circumstances attending Kemper's identification were not unnecessarily suggestive, we need not address whether the failure to litigate the *Biggers* issue precludes relief in this proceeding.

19

testimony in cases like the one before us still leaves state courts, in a habeas context, free to adopt any number of non-*Biggers* procedures designed to ensure the reliability of such testimony." *Kennaugh v. Miller*, 289 F.3d 36, 47 (2d Cir. 2002). One example of such alternative methods to which we have made reference is "a sixth factor in the *Biggers* analysis [that] looked to whether sufficient independent evidence of the defendant's guilt existed to support the reliability of the identification." *Id.* The District Court here acknowledged that "[a] sixth factor not utilized in *Biggers*, 'corroborating evidence of guilt,' has been recognized by another court in this District as an 'objectively reasonable application of Supreme Court law.'" *Dist. Ct. Op.*, 376 F. Supp. 2d at 317 (citing *Vasquez v. Poole*, 331 F. Supp. 2d 145, 157-58 (E.D.N.Y. 2004)). Nevertheless, the District Court concluded that the record in this case contains "little or no corroborating evidence of guilt." *Id.* at 318.

Our review of the record leads us to the opposite conclusion. Specifically, Brisco was first encountered by law enforcement officers a few doors (or less than a tenth of a mile) north of, and across the street from, the residence at which the burglary took place. Indeed, the victim said that after she screamed, the perpetrator, wearing maroon shorts but no shirt, ran in the very direction of the house in which Brisco was found. More than that, the officers found a wet pair of maroon shorts in that house and circumstantial evidence that Brisco had only recently been wearing them. In addition, Brisco admitted that the shorts were his and later admitted that he committed the crime in question.

If this was not compelling enough evidence of the reliability of the eyewitness identification, the record demonstrates that Brisco has a propensity to engage in burglaries. Indeed, the burglary of which he was convicted here was the last of five for which he was apprehended and convicted. While propensity evidence, although plainly relevant, may not be admissible at trial because of "the danger that the jury may condemn the accused because of other criminal behavior, and not because of the evidence of guilt of the crime charged," William Payson Richardson & Jerome Prince, *Prince, Richardson on Evidence* § 4-501, at 175 (Richard T. Farrell ed., 11th ed. 1995); *see also* 2 Jack B. Weinstein & Margaret A. Berger,

20

*Weinstein's Federal Evidence* § 404.10[1] (Joseph M. McLaughlin ed., 2d ed. 2001), we have recognized its relevance in other analogous contexts. Thus, if the issue here was the admissibility of evidence obtained as the result of an allegedly illegal search and seizure, evidence of prior convictions inadmissable at trial would be a relevant consideration in determining probable cause. *See United States v. Wagner*, 989 F.2d 69, 73 (2d Cir. 1993). Indeed, in a case involving the existence of probable cause, based largely on information provided by an informant, the Supreme Court held that evidence that petitioner was known by the police to be a user of drugs "made the charge against him much less subject to scepticism than would be such a charge against one without such a history." *Jones v. United States*, 362 U.S. 257, 271 (1960), *overruled on other grounds by United States v. Salvucci*, 448 U.S. 83 (1980). So too here. The prior robbery and burglary conviction, along with the other corroborative evidence, made the eyewitness identification much less susceptible to a charge of unreliability than it would otherwise be.

Although not ruling it out entirely, we have held that it is improper to consider such corroborative evidence of guilt as a sixth factor in determining the independent reliability of an eyewitness identification. *See Kennaugh v. Miller*, 289 F.3d 36, 47-48 (2d Cir. 2002) ("Although we have recently rejected this 'sixth factor' approach as a matter of federal law in this circuit, choosing instead a harmless error approach, *Raheem v. Kelly*, 257 F.3d 122, 140 (2d Cir. 2001), it seems likely that under the AEDPA, a state court that used a 'sixth factor' analysis would be applying the *Manson* requirements in a perfectly reasonable way."). Because here, as in *Kennaugh*, the state courts did not use a "sixth factor analysis," we have no occasion to pursue this issue further. Instead, "as the Supreme Court has done, we . . . acknowledge [this factor as one of the] other aspects of this case, which, although peripheral, certainly do not detract from our decision." *Gonzalez v. Hammock*, 639 F.2d 844, 848 (2d Cir. 1980) (citing *Manson*, 432 U.S. at 116).

## CONCLUSION

For the reasons stated above, we reverse the judgment of the District Court and deny Brisco's petition for a writ of habeas corpus.

21

EDWARD R. KORMAN, *District Judge*, concurring:

"Judge Friendly's observation a quarter of a century ago that 'the one thing almost never suggested on collateral attack is that the prisoner was innocent of the crime' remains largely true today." *Schlup v. Delo*, 513 U.S. 298, 321-22 (1995) (quoting Henry J. Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments*, 38 U. Chi. L. Rev. 142, 145 (1970)). This appeal from a judgment granting a petition for a writ of habeas corpus is yet another case that confirms Judge Friendly's observation. While the prisoner here challenges the admissibility of an unnecessarily suggestive eyewitness identification, a challenge that on its face goes to the issue of his guilt of the crime with which he is charged, the record contains compelling independent evidence corroborating the reliability of the eyewitness identification. This, for me, provides the basis for denying the writ.

Unlike my colleagues, I am unable to conclude that the on-the-scene identification of petitioner was not unnecessarily suggestive. While I agree that on-the-scene identifications shortly after the commission of a crime are necessary and appropriate, even though they are inherently suggestive, the manner in which the procedure was conducted in this case rendered it significantly more suggestive than the circumstances necessitated. Similarly, while I agree that such an identification may be admissible, if it is found to be independently reliable, I do not believe that the record is sufficiently developed with respect to this issue. Nevertheless, I concur in the reversal of the judgment granting the writ because the overwhelming evidence of the petitioner's guilt is sufficient to make up for any deficiencies in the record with respect to the application of the five factor test prescribed in *Neil v. Biggers*, 409 U.S. 188 (1972), and *Manson v. Brathwaite*, 432 U.S. 98 (1977), upon which the majority relies.

Corroborative evidence of guilt goes to the heart of the Supreme Court cases that initially addressed the problem posed by eyewitness identifications. Those cases developed out of concerns that eyewitness identifications (by strangers) may not be reliable, that juries could not be trusted to evaluate the deficiencies of such apparently compelling evidence, and that the admission of suggestive identifications risked the ultimate injustice – the conviction of an innocent person. In short, the reason the Court involved itself in the first place with suggestively obtained identifications was the recognition that they were a "major factor contributing to the high incidence of miscarriage of justice . . . ." *United States v. Wade*, 388 U.S. 218, 228 (1967); *see also Stovall v. Denno*, 388 U.S. 293, 297 (1967) ("A conviction which rests on a mistaken identification is a gross miscarriage of justice."), *overruled on other grounds by Griffith v. Kentucky*, 479 U.S. 314 (1987). If the reason for ousting the jury from its historic role of evaluating evidence is that suggestively obtained eyewitness identifications can lead to erroneous convictions, then surely independent evidence of guilt provides an essential protection against such "gross miscarriage[s] of justice." *Stovall*, 388 U.S. at 297. As the Eighth Circuit put it, "it seems unnatural to set such evidence aside when one considers that the ultimate purpose of the *Biggers* factors is to avoid eyewitness testimony where there is 'a very substantial likelihood of irreparable misidentification.'" *Graham v. Solem*, 728 F.2d 1533, 1546 (8th Cir. 1984) (en banc).

It is true that *Brathwaite* contains ambiguous language that has been read to oppose the use of other evidence of guilt to establish the reliability of eyewitness identifications. After analyzing the record in light of the five factors articulated in *Biggers*, Justice Blackmun concluded that "[t]hese indicators of [the witness's] ability to make an accurate identification are hardly outweighed by the corrupting effect of the challenged identification itself." *Manson v. Brathwaite*, 432 U.S. 98, 116

23

(1977). Justice Blackmun then stated that, "[a]lthough it plays no part in our analysis, all this assurance as to the reliability of the identification is hardly undermined by the facts that respondent was arrested in the very apartment where the sale had taken place, and that he acknowledged his frequent visits to that apartment." *Id.*

The explanation for this less than edifying analysis may be found in Judge Friendly's opinion in *Brathwaite v. Manson*, 527 F.2d 363 (2d Cir. 1975), which held that the suggestive eyewitness identification was inadmissable under the *Biggers* standard, and which the Supreme Court reversed. Prior to our decision in *Brathwaite*, Judge Friendly observed that "the rule in this circuit is that other evidence connecting a defendant with the crime may be considered on the issue whether there was a substantial likelihood of misidentification." *United States v. Reid*, 517 F.2d 953, 967 (2d Cir. 1975) (citations omitted). Such evidence was present in *Brathwaite*, corroborating the blatantly suggestive eyewitness identification: An undercover police officer had purchased drugs from Brathwaite at an apartment, and there was other evidence linking the defendant to that same apartment. Judge Friendly concluded, however, that this evidence was not strong enough to sustain the admissibility of the eyewitness identification. As he explained: "Perhaps the strongest bit of evidence to strengthen the identification was Brathwaite's arrest in the very apartment where the sale was made. But Brathwaite offered an explanation of this which was not implausible, although evidently not credited by the jury . . . ." *Brathwaite*, 527 F.2d at 372. This may explain Justice Blackmun's unwillingness to rely on the corroborating evidence other than to say, quite consistently with Judge Friendly's analysis, that it did not undermine the reliability of the identification in that case, although it did not enhance it. While Justice Blackmun did not offer this explanation, it is clear that the majority of the Supreme Court there did not expressly hold that the presence of corroboration

24

could never be considered. Indeed, the language Justice Blackmun used does not even rise to the level of dictum to this effect.

Nonetheless, the language used by Justice Blackmun does explain Justice Stevens's separate concurrence in *Brathwaite*, which was not joined by any of the other six members of the majority. Justice Stevens first commended Justice Blackmun's opinion for avoiding what he characterized as the "pitfall" of considering other evidence of guilt. *Brathwaite*, 432 U.S. at 118 (Stevens, *J.*, concurring). He then went on to expressly articulate the view that corroborating evidence should not "be considered to support the admissibility of eyewitness testimony when applying the criteria identified in *Neil v. Biggers*." *Id.* at 118 n.*. "Properly analyzed," he continued, "such facts would be relevant to a question whether error, if any, in admitting identification testimony was harmless." *Id.* While the Stevens opinion clearly says what Justice Blackmun avoided saying, it certainly does not constitute a holding of the Supreme Court that corroborative evidence should not "be considered to support the admissibility of eyewitness testimony when applying the criteria identified in *Neil v. Biggers*." *Id.*

Significantly, after *Brathwaite*, many courts have continued to consider other proof of guilt in deciding whether to admit eyewitness identification testimony. An in-court identification was judged reliable by the Eighth Circuit, in part because two other government witnesses identified the defendant, including the driver of the getaway car. *United States v. Rogers*, 73 F.3d 774, 778 (8th Cir. 1996). As the panel explained, the "additional testimony diminishes any likelihood of irreparable misidentification." *Id.* Similarly, in evaluating the reliability of eyewitness identifications in a drive-by shooting, the Seventh Circuit explained that "[c]orroborated eyewitness testimony is much less suspect than one individual's visual impression." *United States ex rel. Kosik*

25

*v. Napoli*, 814 F.2d 1151, 1156 (7th Cir. 1987). The Seventh Circuit then proceeded to consider, along with the *Biggers-Brathwaite* factors, that a car like the one eyewitnesses described was registered to the defendant, that two other witnesses who did not make identifications gave descriptions of the driver that fit the defendant, and that the shooting took place in the defendant's neighborhood. *Id.* at 1156-57, 1161.

A First Circuit case authored by then-Judge Breyer likewise relied in part on corroborative evidence of guilt in holding that an eyewitness identification was properly admitted. *United States v. Lau*, 828 F.2d 871, 875 (1st Cir. 1987). The corroboration in that case included evidence that one defendant had a license to fly the type of plane used in the crime and another was nearby at the time of the incident. Judge Breyer went through the *Biggers-Brathwaite* factors for and against a correct identification – the witness's confidence in his identifications, opportunity to observe, accuracy of prior descriptions, and the time elapsed between the incident and the identification. *Id.* The corroborating evidence appears as part of this same analysis as one of the "factors [that] weigh in favor of a correct identification." *Id.*; *see also United States v. Wilkerson*, 84 F.3d 692, 695 (4th Cir. 1996) ("Courts may also consider other evidence of the defendant's guilt when assessing the reliability of the in-court identification."). *Contra United States v. Rogers*, 126 F.3d 655, 659 (5th Cir. 1997); *United States v. Emanuele*, 51 F.3d 1123, 1128 (3d Cir. 1995); *Green v. Loggins*, 614 F.2d 219, 225 (9th Cir. 1980).

We too have acknowledged the significance of such evidence before and after *Brathwaite*. Again, in *Reid*, Judge Friendly observed that "the rule in this circuit is that other evidence connecting a defendant with the crime may be considered" to determine an identification's reliability. *Reid*, 517 F.2d at 967 (citing *United States ex rel. Gonzalez v. Zelker*, 477 F.2d 797, 803-04 (2d Cir. 1973);

26

*United States v. Bynum*, 485 F.2d 490, 503-04 (2d Cir. 1973), *vacated on other grounds*, 417 U.S. 903 (1974)). Nevertheless, our case law on this issue has been something less than a seamless web. In *Raheem v. Kelly*, 257 F.3d 122 (2d Cir. 2001), without reference to the rule in this circuit established by the foregoing precedent, and without reference to the deferential scope of review mandated by 28 U.S.C. § 2254(d), we rejected an argument that an unnecessarily suggestive identification could be deemed reliable because of evidence of the defendant's guilt. *Id.* at 140-41. More recently, in *Kennaugh v. Miller*, 289 F.3d 36, 47-48 (2d Cir. 2002), specifically referencing the appropriate deferential standard of review applicable to habeas corpus proceedings, we observed that, "[a]lthough we have recently rejected this 'sixth factor' approach [which looks to corroborative evidence of guilt] as a matter of federal law in this circuit, choosing instead a harmless error approach, *Raheem v. Kelly*, 257 F.3d 122, 140 (2d Cir. 2001), it seems likely that under the AEDPA, a state court that used a 'sixth factor' analysis would be applying the *Manson* requirements in a perfectly reasonable way."

In any event, the focus of our decision in this habeas corpus case, as we have observed in response to a recent reminder by the Supreme Court, is not on "warring decisions among the federal circuits," *Rodriguez v. Miller*, 537 F.3d 102, 106 (2d Cir. 2008) (*citing Carey v. Musladin*, 549 U.S. 70, 74 (2006)), or on inconsistencies in our own case law. Instead, the issue is whether, considering the independent corroborative evidence of the petitioner's guilt, the state courts' rejection of petitioner's challenge to the admissibility of the unnecessarily suggestive eyewitness identification was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). "[C]learly established Federal law . . . refers to the holdings, as opposed to the dicta." *Musladin*, 549 U.S. at

74 (quoting *Williams v. Taylor*, 529 U.S. 362, 365 (2000)). No holding of the Supreme Court precludes consideration of corroborative evidence in determining the independent reliability of an unnecessarily suggestive eyewitness identification. Because the nature of that evidence in this case is overwhelming, and because it makes up for any deficiencies in the record with respect to the other relevant *Biggers* factors, I join my colleagues in voting to reverse the judgment of the district court granting the writ.