09-2043-cr
*United States v. Weingarten*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term 2009

Argued: April 19, 2010          Decided: January 18, 2011

Docket No. 09-2043-cr

————————————————————————

UNITED STATES OF AMERICA,

*Appellee*,

-v.-

ISRAEL WEINGARTEN,

*Defendant-Appellant*.

————————————————————————

Before:      CABRANES, WESLEY, and LIVINGSTON, *Circuit Judges*.

Appeal from a conviction by a jury in the United States District Court for the Eastern District of New York (Gleeson, *J.*) on two counts of transportation of a minor with intent to engage in criminal sexual activity, in violation of 18 U.S.C. § 2423(a), and three counts of travel with intent to engage in illicit sexual conduct, in violation of 18 U.S.C. § 2423(b). Although we hold that § 2423(b) is applicable to conduct occurring outside the United States, we conclude that travel by a United States citizen between two foreign countries, absent any territorial nexus to the United States, does not constitute "travel[] in foreign commerce" within the meaning of the statute. Accordingly, we reverse Weingarten's conviction as to Count Three. In a separate summary order

filed today, we reject Weingarten's remaining arguments and affirm his other counts of conviction.

AFFIRMED in part, REVERSED in part, and REMANDED.

> ANDREA GOLDBARG, Assistant United States Attorney (Jo Ann M. Navickas, Assistant United States Attorney, *on the brief*), *for* Benton J. Campbell, United States Attorney, Eastern District of New York, Brooklyn, NY, *for Appellee*.
>
> DEMOSTHENES LORANDOS (Ashish S. Joshi, *on the brief*), Lorandos & Associates, Ann Arbor, MI, *for Defendant-Appellant*.

DEBRA ANN LIVINGSTON, *Circuit Judge*:

Defendant-Appellant Israel Weingarten ("Weingarten") appeals from a May 8, 2009, judgment of the United States District Court for the Eastern District of New York (Gleeson, *J.*), sentencing him to a total of 30 years' imprisonment and three years' supervised release following his conviction by a jury on two counts of transportation of a minor with intent to engage in criminal sexual activity, in violation of 18 U.S.C. § 2423(a), and three counts of travel with intent to engage in illicit sexual conduct, in violation of 18 U.S.C. § 2423(b). Weingarten was sentenced to ten years' imprisonment on each of the five counts, with the sentences pursuant to the first three counts—the two counts under § 2423(a) and the first count under § 2423(b)—to run consecutively, and the sentences pursuant to the remaining two counts to run concurrently with each other and with those under the first three counts.

Prior to trial, Weingarten moved to dismiss the charges against him, alleging, *inter alia*, that Count Three of the indictment—the § 2423(b) count for which he ultimately received a ten year, consecutive sentence—was improper because the alleged conduct involved only travel between Belgium and Israel. He renews his arguments regarding Count Three on appeal. According to

2

Weingarten, travel that is without a territorial nexus to the United States is not "travel[] in foreign commerce" within the meaning of § 2423(b). Alternatively, if the statute does include such travel, Weingarten argues that it exceeds Congress's authority under the Foreign Commerce Clause.

Although we hold that § 2423(b) applies to conduct occurring outside the United States, we conclude that travel between two foreign countries, absent *any* territorial nexus to the United States, does not constitute "travel[] in foreign commerce" for the purpose of § 2423(b). We thus do not reach Weingarten's constitutional argument. In an accompanying summary order filed today, we reject Weingarten's remaining challenges to his conviction. Accordingly, we reverse his conviction on Count Three, affirm his conviction on Counts One, Two, Four, and Five, and remand for resentencing on those affirmed counts of conviction.

## BACKGROUND

Because "the task of choosing among competing, permissible inferences is for the [jury and] not for the reviewing court," *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001), we are required to review the evidence "in the light most favorable to the government," *United States v. Gaskin*, 364 F.3d 438, 459 (2d Cir. 2004). Accordingly, we "resolve all issues of credibility in favor of the jury's verdict." *United States v. Desena*, 287 F.3d 170, 177 (2d Cir. 2002) (internal quotation marks omitted); *see generally Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979).

Evidence introduced at Weingarten's trial demonstrated that at the time of the events underlying his conviction on multiple counts, Weingarten and his family were all members of the Satmar sect of Hasidic Judaism. Weingarten and his ex-wife have a total of eight children, the oldest being a son born shortly after their marriage in 1979, and the next oldest being "Doe," a daughter

3

born in 1981. Weingarten is a United States citizen, but he moved with his family to Antwerp, Belgium in approximately 1984.

When Doe was nine or ten years old, Weingarten began abusing her sexually. This abuse continued for more than six years and worsened over time. When Doe first informed her mother that she had been abused, Weingarten beat Doe with his fists and kicked her between her legs. When Doe was thirteen or fourteen years old, she began to resist Weingarten's advances and threatened to tell others about the abuse. After an occasion on which Doe's mother entered her bedroom to find Weingarten and Doe in bed together, Doe again informed her mother of the abuse. Weingarten warned Doe that she would not be believed because of the respect in which he was held in the Satmar community, and because she would have no evidence of the abuse, as he had never had intercourse with her. Doe's mother promised to confront Weingarten, but when she did so, Weingarten beat Doe so severely that he would not permit her to return to school for several weeks for fear that her bruises would be seen. When Doe did return to school, she spoke with her principal about what was occurring. Eventually, a rabbi of the Belgian Satmar community brought Doe before a rabbinical court, where she testified against her father. Afterward, the rabbi arranged to have Doe sent to England to live with his daughter and attend school there. Doe remained in England for several months.

Weingarten's criminal charges covered events beginning in 1997, after Doe returned to Belgium. Upon Doe's return from England, Weingarten informed her that the family, resident in Belgium for over thirteen years, would be moving to Israel because of the bad name she had given them by complaining publicly about the abuse. On April 14, 1997, the family traveled from Belgium to Bet Shemesh, Israel. While in Bet Shemesh, Doe, then 16, was sexually abused by her father. She

4

was not permitted to be in public alone, and was required to sleep separately from the other children.

On May 13, 1997, Weingarten, his wife, Doe, and her younger siblings returned to Antwerp to finish packing for the move to Israel. Weingarten continued to sexually abuse Doe almost every night, often while her mother slept in the same room. The family subsequently returned to Israel, where the abuse continued.

On July 30, 1997, Weingarten and Doe traveled from Israel to Brooklyn, New York, where Weingarten's father was ill and dying. During the visit, Weingarten sexually abused Doe at her uncle's house in Brooklyn. After Weingarten's father died, Weingarten and Doe flew from Brooklyn to Antwerp, arriving on August 19. Alone with Doe at the apartment in Antwerp for about a month, Weingarten sexually abused her "night and day, every day." Trial Tr. 290:14. Doe informed her father that she wanted to return to Israel. Weingarten consented, but as a condition of her return, he required Doe to record a conversation with a male neighbor, in which she was to give the impression that she previously had seduced the neighbor. Weingarten informed Doe that he planned to play the tape for rabbis in the Satmar community, so that they would believe his claims that she was sexually promiscuous and he had never molested her.

Doe returned to Israel in September 1997. She and her mother contacted the rabbi in Belgium who had previously been involved in sending Doe to England, who then assisted Doe in returning to school there. Although Weingarten later traveled to England and confronted Doe, the police intervened, she successfully obtained a protective order against him, and no further abuse occurred. Doe remained in England for some time, but eventually moved to New York, where she married a man from the Satmar community. The marriage lasted only about a year, after which Doe abandoned her religious life, left New York, and legally changed her name.

5

Weingarten was not prosecuted until years later, when the abuse was brought to the attention of the Federal Bureau of Investigation. A sealed federal indictment was filed against him on August 18, 2008. Counts One and Four charged him in relation to his July 30, 1997, travel from Israel to Brooklyn, alleging respectively that he transported Doe in foreign commerce with the intent that she engage in unlawful sexual activity, in violation of 18 U.S.C. § 2423(a), and that he traveled in foreign commerce for the purpose of engaging in illicit sexual conduct, in violation of 18 U.S.C. § 2423(b). Counts Two and Five of the indictment charged Weingarten with the same offenses, respectively, in relation to his August 19, 2007, travel from Brooklyn to Antwerp. Finally, Count Three charged Weingarten with a separate violation of 18 U.S.C. § 2423(b) in relation to his April 14, 1997, travel between Belgium and Israel at the time he and his family relocated from Antwerp to Bet Shemesh. After a seven day jury trial, Weingarten was convicted on all five counts against him. This appeal followed.

## DISCUSSION

With respect to Count III, Weingarten argues that the district court erred in failing to dismiss that count of the indictment, which related to his April 1997 travel from Belgium to Israel, on the grounds that travel involving no territorial nexus with the United States is not "travel[] in foreign commerce" as required by § 2423(b), and if such travel is in fact covered by the statute, it exceeds the scope of Congress's authority under the Foreign Commerce Clause. We review *de novo* a district court's legal conclusions, including its interpretations of federal statutes and determinations regarding their constitutionality. *See, e.g.*, *United States v. Stewart*, 590 F.3d 93, 109 (2d Cir. 2009); *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 392 (2d Cir. 2008). Because our answer

6

to the question of statutory interpretation presented here requires reversal of Weingarten's conviction pursuant to Count Three, we address only that issue, and do not reach his constitutional challenge to § 2423(b).

### I. *Section 2423(b) Is Applicable to Extraterritorial Conduct*

At the time of Weingarten's offense conduct, 18 U.S.C. § 2423(b), pursuant to which Weingarten was charged in Count Three of his indictment, provided as follows:

> A person who travels in interstate commerce, or conspires to do so, or a United States citizen or an alien admitted for permanent residence in the United States *who travels in foreign commerce*, or conspires to do so, for the purpose of engaging in any sexual act (as defined in section 2246) with a person under 18 years of age that would be in violation of chapter 109A if the sexual act occurred in the special maritime and territorial jurisdiction of the United States shall be fined under this title, imprisoned not more than 10 years, or both.

18 U.S.C. § 2423(b) (emphasis added).[1]  Since § 2423(b) does not contain a particularized definition of "foreign commerce," it relies on the general definition of that term found in 18 U.S.C. § 10, which states only that, for the purposes of Title 18, "[t]he term 'foreign commerce' . . . includes commerce with a foreign country."

This Court has considered § 2423(b) in cases involving travel in both interstate and foreign commerce. *See, e.g.*, *United States v. Hawkins*, 513 F.3d 59 (2d Cir. 2008); *United States v. Irving*, 452 F.3d 110 (2d Cir. 2006); *United States v. Han*, 230 F.3d 560 (2d Cir. 2000).  Neither the Supreme Court nor this Court, however, has addressed the question of interpretation at issue here—namely, whether a United States citizen, in travel involving *no* territorial nexus to the United

---

[1] 18 U.S.C. § 2423 was subsequently amended in ways not relevant to this appeal.  Unless otherwise noted, all statutory references in the text are to the statute as it existed at the time of the acts underlying Weingarten's conviction.

States, violates § 2423(b) by traveling between two foreign countries with the purpose of engaging in a sex act with a minor. Accordingly, we begin our review of this question with the statute's text. *See In re New York Times Co.*, 577 F.3d 401, 406 (2d Cir. 2009) ("In construing the text of any federal statute, we first consider the precedents that bind us as an intermediate appellate court, which provide definitive interpretations of otherwise ambiguous language. Insofar as those precedents fail to resolve an apparent ambiguity, we examine the text of the statute itself, interpreting provisions in light of their ordinary meaning and their contextual setting.").

As the Government acknowledges, in considering the applicability of § 2423(b) to conduct occurring wholly beyond the borders of the United States, our review of the statutory text occurs against the backdrop of two well-established presumptions. The first is the "presumption that Congress does not intend a statute to apply to conduct outside the territorial jurisdiction of the United States" unless it "clearly expresses its intent to do so." *United States v. Yousef*, 327 F.3d 56, 86 (2d Cir. 2003) (citing *Foley Bros. v. Filardo*, 336 U.S. 281, 285 (1949)). The second is the familiar rule of *Murray v. The Charming Betsy*, 6 U.S. (2 Cranch) 64 (1804), that "an act of [C]ongress ought never to be construed to violate the law of nations, if any other possible construction remains." *Weinberger v. Rossi*, 456 U.S. 25, 32 (1982) (quoting *Charming Betsy*, 6 U.S. (2 Cranch) at 118); *see also Cheung v. United States*, 213 F.3d 82, 92 (2d Cir. 2000). We agree with the Government that neither of these presumptions requires us to conclude that § 2423(b) is categorically inapplicable to conduct occurring overseas.

The Supreme Court recently reiterated that the presumption against extraterritorial application "represents a canon of construction, or a presumption about a statute's meaning, rather than a limit upon Congress's power to legislate." *Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct.

8

2869, 2877 (2010). The canon is not a "clear statement" requirement, *"if by that is meant a requirement that a statute say 'this law applies abroad,'"* and so "[a]ssuredly, context can be consulted as well" in searching for a clear indication of statutory meaning. *Id.* at 2883; *see also Kollias v. D & G Marine Maint.*, 29 F.3d 67, 73 (2d Cir. 1994) (noting that *E.E.O.C. v. Aramco*, 499 U.S. 244, 248 (1991)*,* and subsequent Supreme Court precedents indicate that "reference to nontextual sources is permissible" and that "all available evidence" should be considered in determining whether a statute applies abroad (quoting *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 177 (1993))). The Supreme Court has repeatedly held, however, "that even statutes that contain broad language in their definitions of 'commerce' that expressly refer to '*foreign* commerce' do not apply abroad." *Morrison*, 130 S. Ct. at 2882 (quoting *Aramco*, 499 U.S. at 251); *see also Aramco*, 499 U.S. at 251-52 (discussing cases). In *Aramco*, the Court noted that "[m]any Acts of Congress are based on the authority of that body to regulate commerce among the several States" and if it were to permit "possible, or even plausible," interpretations of boilerplate "commerce" language to override the presumption against extraterritorial application, "there would be little left of the presumption." *Aramco*, 499 U.S. at 253. We thus look for a "clear" and "affirmative indication" that a statute applies to conduct occurring outside the territorial jurisdiction of the United States, *Morrison*, 130 S. Ct. at 2883, before concluding that the presumption has been overcome.

Such a clear and affirmative indication is present here. Section 2423(b) manifestly expresses Congress's concern with conduct that occurs overseas, criminalizing travel in foreign commerce undertaken with the intent to commit sexual acts with minors that "*would be* in violation of chapter 109A *if the sexual act occurred* in the special maritime and territorial jurisdiction of the United States." 18 U.S.C. § 2423(b) (emphasis added). The statute's use of the subjunctive makes clear

9

that the law is aimed at travel preceding such acts, regardless of whether their planned accomplishment is within, or without, the borders of the United States. Thus, while the conduct actually proscribed by the statute involves the combination of travel and the requisite intent, rather than the planned sexual acts themselves, *see Han*, 230 F.3d at 563, it can hardly be said that § 2423(b) evinces only Congress's "primar[y] concern[] with domestic conditions," *Foley Bros.*, 336 U.S. at 285; *cf. United States v. Delgado-Garcia*, 374 F.3d 1337, 1343-45 (D.C. Cir. 2004) (noting that a statute criminalizing conspiracies to induce aliens to illegally enter the United States and attempts to bring illegal aliens into the United States, 8 U.S.C. § 1324(a), "concerns much more than merely 'domestic conditions'").

Moreover, § 2423(b)'s reference to "foreign commerce" is not a "boilerplate" reference of the type the Supreme Court has found insufficient to support extraterritorial application of federal statutes. Rather than forming part of a generic definition, *see, e.g.*, *Aramco*, 499 U.S. at 251, the words "travel[] in foreign commerce" here go to the heart of the statute's operative text, describing the specific conduct proscribed by the statute, *see Pasquantino v. United States*, 544 U.S. 349, 371-72 (2005) (observing in dicta that even if defendants' conduct in violation of wire fraud statute, 18 U.S.C. § 1343, could be deemed to have occurred outside the United States, the statute's prohibition of frauds executed "in interstate or foreign commerce" indicates that "this is surely not a statute in which Congress had only domestic concerns in mind" (internal quotation marks omitted)). Furthermore, § 2423(b) explicitly distinguishes between the class of people who may violate the statute by conspiring to or actually traveling in *interstate commerce* with the proscribed intent (namely, "person[s]") and the narrower class who may also do so with regard to travel in *foreign commerce* (namely, "United States citizen[s] or . . . alien[s] admitted for permanent residence").

10

This distinction evinces Congress's intent to extend the reach of this law beyond American borders in a manner consistent with international law, *see United States v. Pizzarusso*, 388 F.2d 8, 10 (2d Cir. 1968),[2] and would be rendered nonsensical if the law applied only to conduct occurring within United States territory. At least one of our sister circuits, moreover, has relied on an identical reference to "travel[] in foreign commerce" in a later-enacted subsection of § 2423 to find the text of that statute "explicit as to its application outside the United States." *See United States v. Clark*, 435 F.3d 1100, 1106 (9th Cir. 2006).

In addition, although we find the available evidence here sufficient to overcome the presumption against extraterritoriality, there is reason to doubt that the presumption against extraterritoriality applies to § 2423(b) at all. In *United States v. Bowman*, 260 U.S. 94 (1922), the Supreme Court indicated that "Congress is presumed to *intend* extraterritorial application of criminal statutes where the nature of the crime does not depend on the locality of the defendants' acts and where restricting the statute to United States territory would severely diminish the statute's effectiveness." *Yousef*, 327 F.3d at 87 (emphasis added) (citing *Bowman*, 260 U.S. at 98). While "*Bowman* does not hold that criminal statutes *always* apply extraterritorially" and instead requires "judges . . . [to] consider the language and function of the prohibition," *United States v. Leija-Sanchez*, 602 F.3d 797, 799 (7th Cir. 2010), given that Weingarten's statute of conviction expressly proscribes both the substantive offense of traveling in foreign commerce to engage in illicit sexual relations with minors and conspiracy to do so, it is reasonable to conclude that Congress intended

---

[2] In *Pizzarusso*, we observed that of the five bases of criminal jurisdiction recognized by customary international law, "both the territoriality and nationality principles, under which jurisdiction is determined by either the situs of the crime or the nationality of the accused, are universally accepted." 388 F.2d at 10 (noting further that "the United States has relied primarily upon the territoriality and nationality principles").

to proscribe such crimes when hatched abroad, lest the effectiveness of the statute be threatened, s*ee Yousef*, 327 F.3d at 87-88; *see also Delgado-Garcia*, 374 F.3d at 1345-46 (noting that under *Bowman*, the relevant inquiry is whether the offenses covered by the statute are likely to be committed abroad, and concluding that 8 U.S.C. § 1324(a), prohibiting inducement of and attempts at illegal immigration, therefore reaches conduct abroad); *United States v. Plummer*, 221 F.3d 1298, 1304-06 (11th Cir. 2000) (relying on *Bowman* in concluding that the attempt provision of 18 U.S.C. § 545, prohibiting smuggling, applies to conduct outside the United States, and citing similar cases). For this reason and those discussed above, we conclude that the presumption against extraterritoriality is no barrier to the application of § 2423(b) to conduct occurring outside the United States.

Finally, turning to the rule of *Charming Betsy*, we need spend little time explaining why construing § 2423(b) to apply to overseas conduct by American citizens and permanent residents does not violate the presumption that Congress typically does not intend its laws to conflict with the law of nations. Simply put, such application of § 2423(b) violates no rule of customary international law. The nationality principle, which permits a nation to extend its legislative jurisdiction—or "jurisdiction to prescribe"—to cover the conduct of its nationals abroad, is among the most firmly established bases for jurisdiction recognized by international law. *See Pizzarusso*, 388 F.2d at 10; *see also Yousef*, 327 F.3d at 91 n.24 (listing nationality principle as second of five bases of criminal jurisdiction recognized by customary international law); Restatement (Third) of Foreign Relations Law § 402(2). Moreover, although the Restatement indicates that a nation's exercise of jurisdiction must be "reasonable," *see* Restatement (Third) at § 403 (listing factors to be considered), Weingarten does not argue that construing § 2423(b) to reach American citizens and lawful permanent resident

12

aliens acting abroad would be unreasonable under customary international law.

**II.** *"Travel[] in Foreign Commerce" Under § 2423(b) Does Not Include Travel Between Foreign Nations Absent a Territorial Nexus to the United States*

Our conclusion that neither the presumption against extraterritoriality nor the rule of *Charming Betsy* limits § 2423(b) to conduct occurring within the United States is not dispositive as to the question before us. Although we hold that § 2423(b) is applicable to conduct occurring outside the United States, it remains to be determined whether the specific conduct for which Weingarten was convicted under Count Three—travel for the purpose of engaging in a sexual act with his minor daughter where such travel was between two foreign nations, and without any territorial nexus to the United States—falls within the statute's reference to "travel[] in foreign commerce."

The text, unfortunately, is ambiguous in this regard. As noted above, 18 U.S.C. § 10 indicates only that "'foreign commerce' . . . includes commerce with a foreign country." *Cf. Clark*, 435 F.3d at 1114 ("[T]his definition [in § 10] is not particularly helpful given its rearrangement of the words being defined in the definition itself."). The word "commerce" in this context is defined generally as "[t]he exchange of goods and services, esp[ecially] on a large scale involving transportation between cities, states, and nations." Black's Law Dictionary 285 (8th ed. 2004). One inference that certainly might be drawn is that "foreign commerce" refers to "the exchange of goods and services" between the United States and a foreign country—a reading of "foreign commerce," as used in § 2423(b), that is certainly consonant with the statute's enactment pursuant to Congress's power "[t]o regulate Commerce *with* foreign Nations." U.S. Const. art. I, § 8, cl. 3 (emphasis

13

added); *compare id.* (granting the power to regulate commerce "*among* the several States" (emphasis added)). The definition of foreign commerce in § 10, however, only "*includes* commerce with a foreign country," leaving open the possibility that foreign commerce might include something more, such as, for instance, commerce *among* foreign nations. There is little indication, however, of what this something more might be. *See United States v. Montford*, 27 F.3d 137, 139 (5th Cir. 1994) (noting that the definition in § 10 "does not state that foreign commerce is limited exclusively to commerce with a foreign country," but ultimately rejecting the argument that "foreign commerce" includes a "cruise to nowhere," during which the cruise ship departed from and returned to the same United States port without stopping in a foreign country).

The current § 10, as the Fifth Circuit observed in *Montford*, "consolidated and recodified prior provisions of Title 18" that had defined interstate and foreign commerce. *Id.*; *see also* Revisor's Note, 18 U.S.C. § 10 ("This section consolidates into one section identical definitions contained in §§ 408, 408b, 414(a), and 419a(b) . . . ."). In those prior provisions, consolidated in 1948 into what is currently § 10, "interstate or foreign commerce" was specifically defined to include "'transportation from one State, Territory or the District of Columbia to another State, Territory, or the District of Columbia, or to a foreign country; or from a foreign country to any State, Territory, or the District of Columbia.'" *Montford*, 27 F.3d at 139 (quoting *United States v. Goldberg*, 830 F.2d 459, 468 (3d Cir. 1987) (Sloviter, *J.*, dissenting in part)). This earlier definition of "foreign commerce" more clearly suggested that such commerce involved the exchange of goods and services between the United States and a foreign country.

It does not appear that the revised definition in § 10 was meant to effectuate a substantive change. *See id.* (citing *Goldberg*, 830 F.2d at 468 (Sloviter, *J.*, dissenting in part) ("The Revisor's

14

Notes refer to 'slight improvements in style' in the recodified version. However, there is no indication that Congress intended to broaden the definitions of 'foreign commerce' . . . .")). As the Revisor's Note indicates, the primary purpose of the revision, beyond mere "slight improvements in style," was to avoid the narrow connotation of the word "transportation." Revisor's Note, 18 U.S.C. § 10; Black's Law Dictionary 1537 (8th ed. 2004) (defining "transportation" as "[t]he movement of goods or persons from one place to another by a carrier"); *see also United States v. De La Rosa*, 911 F.2d 985, 990 (5th Cir. 1990) ("[T]he purpose of the change was to substitute the broad word 'commerce' for the narrower word 'transportation.' 'Foreign commerce' means to or from the United States."). What the 1948 revision did not evince, however, was a congressional desire to change the parties between which commerce must occur. *See United States v. McRary*, 665 F.2d 674, 678 n.6 (5th Cir. 1982) ("The mere consolidation by the 1948 Revisors, of course, is not evidence of a change in legislative intent."); *cf. Clark*, 435 F.3d at 1114 (noting the Fifth Circuit's observation "that foreign commerce under § 10 'means passing to and fro'" (quoting *Londos v. United States*, 240 F.2d 1, 6 (5th Cir. 1957))). Both the Supreme Court and this Court, moreover, have indicated that, at least as a general matter, "[t]he 1948 Revision was not intended to create new crimes but to recodify those then in existence." *United States v. Reid*, 517 F.2d 953, 957 (2d Cir. 1975) (Friendly, *J.*) (quoting *Morissette v. United States*, 342 U.S. 246, 266-69 n.28 (1952)).

This recodification history is certainly not conclusive and would be entitled to scant, if any, consideration if the definition of "foreign commerce" in § 2423(b) were unambiguous. *See United States v. Wells*, 519 U.S. 482, 497 (1997) (holding that the absence of a materiality requirement in the recodified crime of knowingly making a false statement to a federally insured bank, *see* 18 U.S.C. § 1014, required the Court to interpret that statute as having no such element, notwithstanding

15

the presence of that element in some of the prior false representation crimes that had been consolidated under § 1014 and a Revisor's Note explaining that the change in text was "without change of substance"); *see also Exxon Mobil Corp. v. Allapattah Servs.*, 545 U.S. 546, 568 (2005) (noting that "[e]xtrinsic materials have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms"). Specifically addressing the 1948 recodification, however, the Supreme Court has stated, relying on "established canons of statutory construction," that "it will not be inferred that Congress, in revising and consolidating the laws, intended to change their effect unless such intention is clearly expressed." *Finley v. United States*, 490 U.S. 545, 554 (1989) (internal quotation marks omitted); *see also Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 227 (1957) ("[N]o changes of law or policy are to be presumed from changes in the [1948] revision unless an intent to make such changes is clearly expressed."). We do not perceive any such clear expression here, and the 1948 enactment of § 10, standing alone, surely "would be a strange way to express the substantive revision" required, *see Finley*, 490 U.S. at 554, to read its definition of "foreign commerce" as encompassing all forms of commerce occurring outside the United States and without any nexus whatsoever to this country.

Consideration of § 10's definition as incorporated in other criminal prohibitions in Title 18, moreover, strongly indicates that one does not "travel[] in foreign commerce" simply by traveling between two foreign countries, absent some territorial nexus to the United States. Section 1201 of Title 18, for example, provides in relevant part:

> (a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when

> (1) the person is willfully transported in interstate or foreign commerce; . . . [or]
>
> (2) any such act against the person is done within the special maritime and territorial jurisdiction of the United States; . . .

shall be punished by imprisonment for any term of years or for life . . . .

18 U.S.C. § 1201. In *McRary*, the Fifth Circuit rejected the government's argument that the defendants in that case had been properly charged under subsection (a)(1) for a kidnaping perpetrated on the high seas, in which the victims were subsequently taken to Cuba. 665 F.2d at 675. It held that "the foreign commerce jurisdictional basis mandates that [a] kidnapping take place in the United States and that the victim be subsequently transported to a foreign State." *Id.* at 678. The court correctly observed that to read "transport[] in . . . foreign commerce" to include any transportation to or from a foreign nation, *absent a territorial nexus to the United States*, would render the alternate jurisdictional provision of subsection (a)(2), which limits the statute's coverage of kidnapings on the high seas to include only those aboard vessels owned in whole or in part by United States citizens, largely superfluous. *Id.*

The existence of statutory provisions that would be rendered superfluous by our adoption of an overly expansive interpretation of § 10 provides a compelling reason to reject such an interpretation. *See United States v. Kozeny*, 541 F.3d 166, 171 (2d Cir. 2008). So, too, do inferences properly drawn from the presumption against extraterritoriality, discussed *supra*. The presumption requires careful analysis, on a statute-by-statute basis, of Congress's intent to regulate conduct occurring outside the United States. Given this presumption, we conclude that it would be anomalous to construe the general definition of "foreign commerce" in § 10, upon which many of Title 18's provisions rely in setting out the scope of criminal prohibitions, as including all forms of

17

commerce occurring outside the United States and without nexus whatsoever to this country.

We note, in addition, that the Government has not directed our attention to any precedent suggesting that the words "travel[] in foreign commerce," as used in § 2423(b), encompass travel between two foreign nations absent a territorial nexus to the United States. A review of relevant pattern jury instructions contained in prominent treatises or promulgated by our sister circuits, though non-precedential, further demonstrates that when defining "foreign commerce" for the purpose of statutory provisions subject to § 10's general definition, the common interpretation generally limits such commerce to that involving some nexus to the United States. *See, e.g.*, Kevin F. O'Malley et al., Federal Jury Practice and Instructions § 43.04 (2000) (instructing, "based upon 18 [U.S.C.] § 10," in context of 18 U.S.C. § 1073, that "[t]he phrase 'moves or travels in interstate or foreign commerce' means movement or travel between one state and another or *between one state and a foreign country*" (emphasis added)); Leonard B. Sand et al., Modern Federal Jury Instructions 50A-8 (2005) ("The term 'interstate or foreign commerce' means commerce between any combination of states, territories or possessions of the United States, or *between the United States and a foreign country*." (emphasis added)).[3] We note, finally, that our determination that § 2423(b)

---

[3] *See also* Fifth Circuit District Judges Association Pattern Jury Instructions Committee, Pattern Jury Instructions, Criminal Cases § 1.40 (2001) (noting, as general definition, that "[f]oreign commerce means commerce or travel between any part of the United States, including its territorial waters, and any other country, including its territorial waters"); Committee on Federal Criminal Jury Instructions for the Seventh Circuit, Pattern Federal Jury Instructions for the Seventh Circuit 304 (1998) (instructing, in context of 18 U.S.C. § 2312, that "[t]he term foreign commerce means movement in or out of the United States"); Criminal Pattern Jury Instruction Committee of the United States Court of Appeals for the Tenth Circuit, Criminal Pattern Jury Instructions § 1.39 (2005) (noting, as general definition, that "[f]oreign commerce means commerce between any part of the United States (including its territorial waters), and any other country (including its territorial waters)"); Committee on Pattern Jury Instructions of the Judicial Council of the Eleventh Circuit, Eleventh Circuit Pattern Jury Instructions (Criminal Cases) § 93.2 (2010) (instructing, in specific context of 18 U.S.C. § 2423(b), that "'[i]nterstate or

18

does not extend to travel occurring wholly between foreign nations and without any territorial nexus to the United States appropriately avoids the necessity of addressing whether such an exercise of congressional power would comport with the Constitution. *Cf. Rescue Army v. Mun. Court*, 331 U.S. 549, 569 (1947) (noting canon that "constitutional issues affecting legislation will not be determined . . . if a construction of the statute is fairly possible by which the question may be avoided").

Accordingly, for the foregoing reasons, we conclude that 18 U.S.C. § 2423(b) does not criminalize travel occurring wholly between two foreign countries and without any territorial nexus to the United States. We do not suggest, of course, that the mere presence of an intermediate stop outside the United States on a multi-legged journey undertaken for unlawful purposes will immunize a defendant from prosecution under § 2423(b). An offender violates the law when he embarks on travel with the requisite illicit purpose, *see, e.g.*, *Clark*, 435 F.3d at 1119; *United States v. Bredimus*, 234 F. Supp. 2d 639, 645-46 (N.D. Tex. 2002), and mere stops along the way do not deprive travel of its territorial nexus to the United States. We note, in addition, that the issue of statutory construction that this case presents would be substantially different if § 2423(b) prohibited travel for the purpose of engaging in the defined sexual acts where such travel *affects* foreign commerce. Section 2423(b), however, prohibits travel *in* foreign commerce, and Count Three, which involved simply a flight from Belgium, where the defendant resided, to Israel, his new home, did not constitute such travel.

---

foreign commerce' is the movement or transportation of a person from one state to another state or from a place within the United States to a place outside the United States").

**CONCLUSION**

Because our analysis of the statute of conviction disposes of this appeal, we need not and do not reach Weingarten's argument regarding the scope of Congress's authority to regulate the conduct of United States citizens traveling abroad, whether under the Foreign Commerce Clause or any other grant of power. For the foregoing reasons, and for the reasons stated in the accompanying summary order filed today, Weingarten's conviction as to Count Three is **REVERSED**, his convictions pursuant to the remaining counts in this case are **AFFIRMED**, and the case is **REMANDED** for further proceedings consistent with this opinion.